In the Matter of the Accounting of L. LAWRENCE GREEN, as Executor of JULIA BRAIER, Deceased, Respondent. MILLIE K. KALMANE, as Legatee, Appellant.

Argued January 7, 1953; decided March 5, 1953.

150

*Martin Popper, Paul L. Ross* and *David Sloane* for appellant.
I. Section 269 of the Surrogate's Court Act as herein applied
is unconstitutional. It encroaches upon legislative powers con-
stitutionally vested in the Federal Government. (*Hines* v.
*Davidowitz,* 30 F. Supp. 470, 312 U. S. 52; *Anderson* v. *N. V.
Transandine Handelmaatschappij,* 28 N. Y. S. 2d 547; *Haley*
v. *Sheridan,* 190 N. Y. 331; *Heller* v. *Teale,* 216 F. 387; *The Bello
Corrunes,* 6 Wheat. [U. S.] 152; *Matter of Skewrys,* 181 Misc.

479; *Matter of Zalewski,* 292 N. Y. 332.)   II. Section 269 of the Surrogate's Court Act as applied to this estate is in violation of the Constitution of the United States and treaties under the authority of the United States. (*Lanza* v. *United States,* 22 F. Supp. 716; *Matter of Comincio,* 135 Misc. 733, 229 App. Div. 862, *Santovincenzo* v. *Egan,* 284 U. S. 30; *Hauenstein* v. *Lynham,* 100 U. S. 483; *Asakura* v. *City of Seattle,* 265 U. S. 332; *Makah Indian Tribe* v. *McCauly,* 39 F. Supp. 75; *Nielsen* v. *Johnson,* 279 U. S. 47; *Techt* v. *Hughes,* 229 N. Y. 222; *Clark* v. *Allen,* 331 U. S. 503.)   III. The application of section 269 is unconstitutional in that it is applied in a field in which the Federal Government has jurisdiction and in which the Federal Government has already enacted legislation.   Furthermore, if Federal legislation is applied, section 269 is inapplicable. (*Monongahela Bridge Co.* v. *United States,* 216 U. S. 177; *Second Employers' Liability Cases,* 223 U. S. 1; *United States* v. *National Gypsum Co.,* 49 F. Supp. 206.)   IV. The direction to deposit the moneys in the city treasury without a hearing is inconsistent with all prior decisions under section 269 and is in violation of elementary due process under section 1 of the Fourteenth Amendment of the United States Constitution. (*Matter of Blasi,* 172 Misc. 587; *Matter of Weidberg,* 172 Misc. 524; *Matter of Steiner,* 172 Misc. 950; *Matter of Ramberg,* 174 Misc. 306; *Matter of Plemich,* 176 Misc. 560; *Bandini Co.* v. *Superior Court,* 284 U. S. 8; *United States* v. *Carolene Products Co.,* 304 U. S. 144.)   V. The Treasury Department ruling is not a finding of United States official Government policy.   Further, it has no relationship to the property of foreign nationals derived from estates in this country.   It is not binding on any court.   The declaration of the Secretary of the Treasury cannot constitutionally be a declaration of Government policy.   It has no relation to distributive shares in estates. (*Payne* v. *Griffin,* 51 F. Supp. 588; *Field* v. *Clark,* 143 U. S. 649; *Mahler* v. *Eby,* 264 U. S. 32; *Shouse* v. *Moore,* 11 F. Supp. 784; *United States* v. *Tishman,* 99 F. 2d 951, 306 U. S. 636; *Japan Import Co.* v. *United States,* 86 F. 2d 124; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126; *United States* v. *Foster,* 131 F. 2d 3, 318 U. S. 767; *Youngblood* v. *United States,* 141 F. 2d 912.)

*Charles Ettinger* and *L. Lawrence Green,* in person, for L. Lawrence Green, respondent.  I. The appeal should be dismissed as no constitutional question is directly and primarily presented herein and leave to appeal was not obtained either from the Court of Appeals or the Appellate Division.  (*People ex rel. Ryan* v. *Lynch,* 262 N. Y. 1; *People ex rel. Curtis* v. *Kidney,* 225 N. Y. 299; *Matter of Rueff,* 273 N. Y. 530; *Matter of Haydorn* v. *Carroll,* 225 N. Y. 84; *Matter of Chirillo,* 283 N. Y. 417, 284 N. Y. 583.)  II. The provisions of the decree for deposit of the blocked legacy with the city treasurer complies with prevailing Federal regulations and section 269 of the Surrogate's Court Act.  (*Matter of Weidberg,* 172 Misc. 524; *Matter of Ramberg,* 174 Misc. 306; *Matter of Yee Yoke Ban,* 200 Misc. 499; *Matter of Best,* 200 Misc. 332; *Matter of Getream,* 200 Misc. 543; *Matter of Bold,* 173 Misc. 545; *Matter of Wong Hoen,* 199 Misc. 1119.)  III. The provisions of the former treaty of friendship between the United States and Hungary do not prevent the operation of section 269 of the Surrogate's Court Act.  (*Matter of Plemich,* 176 Misc. 560; *Matter of D'Adamo,* 212 N. Y. 214; *Matter of Hansen,* 155 Misc. 712.)  IV. The application of section 269 of the Surrogate's Court Act is not violative of any constitutional provision.  (*United States* v. *Perkins,* 163 U. S. 625; *Irving Trust Co.* v. *Day,* 314 U. S. 556.)

FULD, J.  Julia Braier, a resident of New York County, died in Czechoslovakia in the fall of 1945, bequeathing her entire estate — which consisted of a savings account in a New York city bank — to her sister, a national and resident of Hungary. In settling the final account of her executor, the surrogate directed that the bequest be deposited, pursuant to the provisions of section 269 of the Surrogate's Court Act, with the Treasurer of the City of New York, for the account of the legatee, and also prohibited withdrawals except on further court order.  Whether that disposition was warranted, or whether — as urged by the Consular Section of the Hungarian Legation appearing as attorney in fact for the legatee — those funds should have been placed " in a blocked account " maintained by the Hungarian Consulate General in a domestic bank, is the question presented.  And, since the

Appellate Division's determination necessarily rests on a decision of constitutional issues, the appeal is properly here as of right (Civ. Prac. Act, § 588, subd. 1; see, also, Cohen & Karger, Powers of the New York Court of Appeals, § 57, pp. 257–258).

Section 269 of the Surrogate's Court Act, upon which the surrogate relied, provides that, '' Where it shall appear that a legatee  *  *  *  would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld, the decree may direct that such money or other property be paid into the surrogate's court for the benefit of such legatee ''.  Contrary to appellant's contentions, that statute is valid; it may not be stricken as unconstitutional, upon the ground (1) that subdivision (b) of section 5 of the federal Trading with the Enemy Act (U. S. Code, tit. 50, Appendix, § 5, subd. [b], as amd. by Appendix, § 616), assertedly pre-empting the field, precludes local legislation such as section 269; (2) that it contravenes the Treaty between the United States and Hungary; or (3) that it encroaches upon federal power over foreign commerce.  We consider each of those grounds.

Section 5, subdivision (b), of the Trading with the Enemy Act grants to the President '' During the time of war or  *  *  * national emergency '' the power to '' regulate  *  *  *  or prohibit, any acquisition, holding, withholding, use, transfer *  *  *  importation or exportation of  *  *  *  any property in which any foreign country or a national thereof has any interest '' except '' upon such terms and conditions as [he] may prescribe ''.  Exercising this authority, the President, in April of 1940, issued Executive Order No. 8389 (United States Code Ann., tit. 12, pp. 456 et seq.; Code of Fed. Reg., Cum. Supp., tit. 3, p. 645) prohibiting, '' except as specifically authorized '', all transactions involving property '' in which any foreign country designated in this Order, or any national thereof, has at any time on or since the effective date of this Order had any interest ''.  Section 3 made March 13, 1941 '' the effective date of this Order  *  *  *  with respect to '' nationals of Hungary.

This federal regulatory scheme, it is self-evident, serves a purpose entirely unrelated to the goal of the New York provision. The national enactment seeks to " check * * * trading with the enemy. Its prime purpose is to stop such uses of foreign property rights as might imperil national defense." (*Polish Relief Comm.* v. *Banca Nationala a Rumaniei,* 288 N. Y. 332, 337; see, also, *Alexewicz* v. *General Aniline & Film Corp.,* 181 Misc. 181, 186.) Section 269 of the Surrogate's Court Act, in contrast, aims " to promote the basic object and obligation of courts of decedent devolution to use their utmost endeavors to effectuate the express or implied wishes of a decedent respecting the disposal of his assets on death." (*Matter of Weidberg,* 172 Misc. 524, 528.) A note appended to section 269, indicative of its design (see *Matter of Pelcyger,* 171 Misc. 1016, 1017), recites that it shall apply " where transmission or payment to a beneficiary, legatee or other person resident in a foreign country might be circumvented by confiscation in whole or in part." (L. 1939, ch. 343, note; see, also, Note, 17 N. Y. U. L. Q. Rev., pp. 314–316; cf. Opton, Legacies to Foreign Residents and the New Amendment to Section 269, Surrogate's Court Act, N. Y. L. J., Sept. 21, 1939, p. 728, col. 1.) Since section 269 treats a matter beyond and outside the scope of the federal law, the area covered by the New York provision could not have been pre-empted by the national enactment. (See *Maurer* v. *Hamilton,* 309 U. S. 598, 602 *et seq.*; *Kelly* v. *Washington,* 302 U. S. 1, 4 *et seq.*; *People* v. *County Transp. Co.,* 303 N. Y. 391, 396–397, 402.)

Not only do the two provisions treat variant problems, but, equally important, their application — as illustrated by the case before us — in no way conflicts. As the Consular Section concedes, Executive Order No. 8389 bars delivery of the bequest to the foreign legatee, requiring, instead, its deposit " in a blocked account in a domestic bank or with a public officer, agency, or instrumentality designated by a court having jurisdiction of the estate ". (Public Circular No. 20, issued Oct. 23, 1942 [Code of Fed. Reg., Cum. Supp., tit. 31, p. 8926], explaining General License 30A [Code of Fed. Reg., Cum. Supp., tit. 31, § 131.30 a] issued under Executive Order No. 8389.) Achieving exactly the same result, the surrogate herein relied on

section 269 to direct deposit of the bequest with the city treasurer. And this action has been approved by the very official charged with effectuating the goals of the federal statute; he wrote, in response to the executor's request for a license to transfer the bequest to the city treasurer, that "It would be in accordance with the policy of this Office to issue such a license". Since a state provision "will be stricken only if — in terms or in practical administration — it conflicts with the Federal law or infringes on its policy ", it necessarily follows that section 269 may stand along with subdivision (b) of section 5 of the Trading with the Enemy Act. (*Quaker Oats Co.* v. *City of New York,* 295 N. Y. 527, 534, affd. *sub nom. Hill Packing Co.* v. *City of New York,* 331 U. S. 787; see, also, *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202; *Cloverleaf Co.* v. *Patterson,* 315 U. S. 148; *Kelly* v. *Washington, supra,* 302 U. S. 1; *Gilbert* v. *Minnesota,* 254 U. S. 325.)

Nor does the surrogate's application of section 269 contravene provisions of the Treaty between this government and Hungary.[1] Nothing contained in that Treaty compels, or even sanctions, transfer of the bequest to the Hungarian Consular officer. Article XXI of the Treaty (44 U. S. Stat. 2459) — the article relied on by appellant — recites: " A consular officer of either High Contracting Party may in behalf of his non-resident countrymen receipt for their distributive shares derived from estates in process of probate * * * *provided he remit any funds so received through the appropriate agencies of his Government to the proper distributees* ". (Emphasis supplied.) By the proviso just quoted, the consular officer must be in a position to " remit " the funds in question " to the proper distributees ". That cannot, of course, be done in this case. The law of this country, as previously noted, expressly bars export of the funds. Indeed, when, on another occasion, the Hungarian Consul asserted his rights under the Treaty, the court decided against him, saying that, by reason of the freezing

---

1. Although the Treaty expired on July 5, 1952 (see State Department Bulletin, Vol. XVIII, No. 455, pp. 382–383; Vol. XXV, No. 629, pp. 95–96; Vol. XXV, No. 649, p. 914; Vol. XXVI, No. 667, p. 946), and is no longer in effect, we have assumed that its provisions are here controlling, since it was in force when the case was decided by the surrogate. (Cf. *Santovincenzo* v. *Egan,* 284 U. S. 30, 36.)

order, '' there is an inference that if the share were paid to the Consul it would not reach the distributee himself.'' (*Matter of Plemich,* 176 Misc. 560, 561; see, also, *Matter of Yee Yoke Ban,* 200 Misc. 499, 500.) Since, then, the Consular Section could not '' remit   *   *   *   to the proper distributees ''— to use the language of the Treaty — article XXI did not require that the funds be deposited in its name. It follows, therefore, that deposit of the bequest with the city treasurer, pursuant to section 269, in no way conflicts with the rights of either Consular Section or legatee under the Treaty.

We must likewise reject the contention that the New York statutory provision encroaches on national power '' to regulate Commerce with foreign Nations '' (U. S. Const., art. I, § 8). This state adopted section 269 to insure the intended distribution of estates administered by its courts.  '' *   *   * every state   *   *   *   possesses [the power] of regulating the manner and term upon which property real or personal within its dominion may be transmitted by last will and testament ''. (*Mager* v. *Grima,* 8 How. [U. S.] 490, 493.) Incident to that power, each '' state establishes the procedure governing the probate of wills and the processes of administration.'' (*Lyeth* v. *Hoey,* 305 U. S. 188, 193.) Barring any '' overriding federal policy,'' that state procedure should be honored. (See *Clark* v. *Allen,* 331 U. S. 503, 517; see, also, *Irving Trust Co.* v. *Day,* 314 U. S. 556; *Rocca* v. *Thompson,* 223 U. S. 317; *Matter of D'Adamo,* 212 N. Y. 214; *Matter of Deyo,* 180 Misc. 32, 39.)

Thus, absent any clash with national policy, the Supreme Court has upheld the right of a state (1) to impose a special tax on legacies to aliens (see *Mager* v. *Grima, supra,* 8 How. [U. S.] 490); (2) to limit the right of foreign consuls to administer estates of their nationals (see *Rocca* v. *Thompson, supra,* 223 U. S. 317; see, also, *Matter of D'Adamo, supra,* 212 N. Y. 214); (3) to grant aliens an unqualified right to inherit property within its borders (see *Blythe* v. *Hinckley,* 180 U. S. 333); or (4) to make that right dependent on existence of a reciprocal right on the part of United States citizens in the alien's country. (See *Clark* v. *Allen, supra,* 331 U. S. 503, 516–517.) Section 269 stands as a like exercise of state power over the administration of estates.

Concluding, then, that section 269 does not offend against any constitutional provision, we consider whether the surrogate properly applied the statute. The fact that this bequest consisted of " blocked funds " does not mean, as appellant argues, that section 269 is not needed. Since federal blocking regulations depend on considerations of national defense, the freezing order might conceivably be lifted, without assurance that the legatee would receive the funds. Section 269 is the means, in such a case, of assuring transmission of the bequest to its proper owner.

Moreover, the surrogate noted and properly relied upon the United States Treasury Department's conclusion — contained in its Regulation of February, 1951 — that, with respect to checks or warrants drawn against funds of the United States in favor of Hungarian nationals, " local conditions * * * in * * * Hungary * * * are such that there is not a reasonable assurance that a payee in those areas will actually receive " payment or be able to negotiate them " for full value " (16 Federal Register 1818, amdg. Code of Fed. Reg. [1949 ed.], tit. 31, § 211.3, subd. [a]). That regulation was made, it should be noted, with the benefit of all the sources of information concerning conditions in Hungary that are available to a department of the federal government, and not to the surrogate. Nor may the finding be limited to government checks or notes, for a check drawn on government funds would be no less likely to reach an Hungarian payee than would a draft on any private account. The authoritative conclusion reached by the Treasury Department, therefore, was directly relevant to the surrogate's determination, under section 269, that the legatee would not have the " benefit or use or control of the money " or that " other special circumstances [made] it appear desirable that such payment should be withheld ". Similar Treasury findings have been relied on to withhold and deposit, under the New York statute, bequests made to citizens, not only of Hungary (*Matter of Getream,* 200 Misc. 543), but Russia (*Matter of Best,* 200 Misc. 332), Lithuania (*Matter of Geffen,* 199 Misc. 756), the Republic of China (*Matter of Yee Yoke Ban, supra,* 200 Misc. 499, 500) and Occupied Norway (*Matter of Ramberg,* 174 Misc. 306). As in those

cases, so here, the Treasury's finding supplies sufficient basis in fact for the application of section 269.

And, finally, to the plaint that the surrogate violated the demands of due process by failing to grant a hearing, there are several answers.

In the first place, the legatee has not been deprived of her property. Concededly, she has title to the bequest; it has been set aside for her benefit and account, and is hers for the asking when reasonable assurance is given that she will receive it. As one court put it, section 269, " far from constituting an impairment of [her] rights, was designed as and in fact is, a potent protector thereof." (*Matter of Weidberg, supra,* 172 Misc. 524, 531.) Nor is her right to possession postponed. Quite apart from the fact that Executive Order No. 8389 would, in any event, have compelled deposit of the bequest in a blocked account, the surrogate actually concluded that, because of conditions in Hungary, the probability was that, even if the funds had been transmitted to Hungary, the legatee would not have received them. As soon as conditions in that country change — and the laws of our government permit unblocking of the funds belonging to an Hungarian national — the surrogate will undoubtedly order the funds withdrawn from the city treasury and transmitted to the legatee. Manifestly, section 269 was designed, and was here invoked, to protect the legatee's property and to insure that she receives it.

In the second place, there has in no event been denial of due process. The Consular Section raised only issues of law, and the hearing of such questions upon appeal affords a full measure of due process. (See *American Sur. Co.* v. *Baldwin,* 287 U. S. 156, 168; *York* v. *Texas,* 137 U. S. 15, 20; see, also, *Phillips* v. *Commissioner,* 283 U. S. 589, 596–597.) At no point did appellant deny the fact — indicated by the Treasury Department in its 1951 regulation (16 Federal Register 1818, amdg. Code of Fed. Reg. [1949 ed.], tit. 31, § 211.3, subd. [a]) — that conditions in Hungary negate the likelihood that the legatee would receive her bequest, and at no time during the pendency of the proceeding in the Surrogate's Court was a hearing sought on that issue.

Moreover, and of transcendent importance, appellant may still have a hearing on that question. Under the decree before us, the Consular Section is privileged to apply at any time to the surrogate for an order permitting it to withdraw the funds in question from the city treasury. (See *Matter of Landau,* 187 Misc. 925; *Matter of Alexandroff,* 61 N. Y. S. 2d 866.) And, upon such application, it may show that conditions in Hungary justify the belief that the legatee will receive her bequest. The assurance of such a hearing fully satisfies the demands of due process. (Cf. *Chase Securities Corp.* v. *Donaldson,* 325 U. S. 304, 309, n. 5, par. 2; *American Sur. Co.* v. *Baldwin, supra,* 287 U. S. 156, 168; *York* v. *Texas, supra,* 137 U. S. 15, 20.)

The order should be affirmed, with costs.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND, DYE and FROESSEL, JJ., concur.

Order affirmed. [See 305 N. Y. 691.]