## Zupko Estate

*Albert L. Bricklin*, for accountant.

*James Francis Lawler*, for claimants.

*Irvin Stander, Frederick Fiegenberg, Judith J. Jamison* and *Ralph S. Snyder*, for Commonwealth.

BOLGER, J., December 19, 1958.—Decedent died September 19, 1956, leaving a will which was duly admitted to probate. He was unmarried and was not survived by issue. . . .

By his will dated January 25, 1952, a copy of which is annexed, testator gave $100 to his friend, Alice Ruth Youmans, $1,000 to his landlady, Catherine Gerasin, and his residuary estate to his brother, Terenti Leonov Zubchenko, and his five sisters, Aleksandra Leonova Barkun, Fiokla Leonova Sliatskaya, Domenkkia Leonova Zubchenko, Sofia Leonova Azharonok and Olga Leonova Guchok in equal parts. He directed that should any of his sisters or brother predecease him, his or her share is to be divided among his or her children in equal parts and he designated the Provident Trust Company of Philadelphia, later Provident Tradesmens Bank and Trust Company, executor.

Testator's brother and five sisters survived him. All are residents of the Union of Socialist Soviet Republics.

Claimants are represented by Ostroff and Lawler, Esqs., under powers of attorney allegedly executed by claimants before a Soviet notary whose authority is certified by an American consul.

The Attorney General of the Commonwealth of Pennsylvania has attacked the validity of the powers of attorney allegedly executed by claimants in the USSR and has claimed the funds which are now distributable under section 2 of the Act of July 28, 1953, P. L. 674, which act, popularly but improperly referred to as The Iron Curtain Act, provides that the court must determine whether distributees who are residents of alien countries will receive "the actual benefit, use, enjoyment or control of the money or other property distributed. . . ."

This is the first of several estates in which distribution to residents of foreign countries is to be determined upon the basis of factual testimony in addition to elements of judicial notice.

Two preliminary basic questions must be determined: Are the powers of attorney valid and is the Act of July 28, 1953, constitutional?

The Attorney General cites Sobko Estate, 88 D. & C. 76 (1954), and Garrett's Estate, 335 Pa. 287. Counsel for claimants rely upon the Acts of Congress of June 25, 1948, as amended May 24, 1949, c. 139, sec. 92(b), 63 Stat. 103, 28 U. S. C. A. §1741, and the Pennsylvania Acts of April 27, 1876, P. L. 49, sec. 1, 28 PS §223, and of July 24, 1941, P. L. 490, sec. 9, as amended June 21, 1947, P. L. 855, sec. 1, 21 PS §291.9(3).

In this as in all other cases, claimants have the burden of proof to establish their claim: Link's Estate (No. 1), 319 Pa. 513. In Sobko Estate, supra, decedent died intestate. President Judge Klein refused to accept the power of attorney for appearance because of the lack of proof of identity and of relationship of claimants, that possible fraud, coercion or other invalidating circumstances attended the execution of the power.

Under Garrett's Estate, supra, we have the power to reject powers of attorney of foreign claimants. How-

ever, claimants' problem is eased greatly because they are not only named in the will, but their home province in the USSR is also stated therein. In addition there were found by the executor, after testator's death, numerous letters and other written matter from which the identity of claimants is clearly established. Proof was also presented that from 1949 until the date of his death, testator had sent packages to claimants whose receipts for them were transmitted by the sending agency to testator. In the light of these facts, the Commonwealth's contention constitutes no reasonable objection to the acceptance of the appearance as proof of the identity of claimants. It is not necessary to determine the validity of the powers of attorney as instruments of conveyance or to determine whether they were freely executed without corcion or duress. No evidence on this question has been presented and the finding of the court is limited solely to proof that claimants are the persons designated as legatees under the will of decedent.

Section 2 of the Act of 1953, supra, provides as follows: "Whenever it shall appear to the court that if distribution were made a beneficiary would not have the actual benefit, use, enjoyment, or control of the money or other property distributed to him by a fiduciary, the court shall have the power and authority to direct the fiduciary (a) to make payment of the share of such beneficiary at such times and in such manner and amounts as the court may deem proper, or (b) to withhold distribution of the share of such beneficiary, convert it to cash, and pay it through the Department of Revenue into the State Treasury without escheat."

The act is constitutional. It is to be observed that the act has universal application. It is not discriminatory to the nationality or residence of testator or intestate, or of the distributees. Its purpose is the promotion of the fundamental duty of courts to determine

who is entitled to decedent's property at death, whether they are under disability and to assure its transmittal to them. It does not offend the treaty-making power of the United States. In Clark v. Allen, 331 U. S. 503, Justice Douglas, in passing upon the constitutionality of the California Reciprocity Act,[1] held that rights in succession to property are determined by local law and are not in the domain of negotiating with a foreign country. Such laws do not conflict in terms or in practical administration with any Federal law. See also Hill Packing Co. v. City of New York, 331 U. S. 787; Union Brokerage Co. v. Jensen, 322 U. S. 202, both cited in Matter of Braier, 305 N. Y. 148 (1953).

No lack of due process is involved. Claimants are not being deprived of their property. They retain title to it. It is being set aside temporarily at interest for their benefit and account and is theirs for the asking upon application to this court when reasonable assurance is given that they will receive it. The acts in various States serve as a protection of their rights: Matter of Braier, supra; Petition of Mazurowski, 331 Mass. 33, 116 N. E. 2d 854 (1954).[2]

In the last cited case the court said: ". . . The responsibility rested upon the judge to see that the parties are entitled to receive their funds at full value." In Petition of Mazurowski, supra, the application of a statute similar to our own was involved. The court there held that the Massachusetts act is a reasonable and valid regulation of the final distribution of estates in the consideration of which conditions in foreign countries was one of the motivating legislative purposes, and was designed to protect the property interests of the distributees. It "is binding upon them even

---

[1] The California act involves outright escheat to the State.

[2] The Massachusetts act also requires the personal appearance of claimants.

though enacted after the death of the decedent". Citing Backus v. Fort Street Union Depot Company, 169 U. S. 557; Gibbes v. Zimmerman, 290 U. S. 326, and Cooley Constitutional Limitations 8th ed. 754-56. In the Mazurowski case the question was raised as to the possible violation of a United States treaty with Poland. The court held that the treaty was not violated because the treaty did not purport to create special rights of succession in favor of aliens, citing, inter alia, Lyeth v. Hoey, 305 U. S. 188, 193; Irving Trust Co. v. Day, 314 U. S. 556; U. S. v. Bierman, 339 U. S. 87, and Clark v. Allen, supra. We subscribe to these legal conclusions.

The Pennsylvania act does not require our courts to sit in judgment upon the acts of another country. Our function is merely to inquire into the political, economic and social conditions existing in the USSR as a guide in determining whether the property of a Pennsylvania decedent will be distributed in accordance with the terms of his will and in accordance with the law of Pennsylvania. It, therefore, does not come within the purview of Underhill v. Hernandez, 168 U. S. 250, or Oetjen v. Central Leather Company, 246 U. S. 297.

It is clear that the instant act has two purposes. The first is as stated, decedent devolution, but along with that is the prevention of the enrichment of foreign governments to the deprivation of distributees, especially those governments whose purposes are at variance with our own and who may employ such funds and property directly or indirectly for uses inimical to our country. As developed in the testimony, the government of the USSR in currently benefiting by citizens of this country sending money or packages to persons in the USSR, substantially as hereinafter stated. Resistance to these acquisitions for unfriendly military and international economic purposes is set forth in a

United States Treasury Regulation appearing in 31 CFR, sec. 211.3, which contains a list of the countries to which United States Treasury checks are not sent, viz., Albania, Bulgaria, Communist-controlled China, Czechoslovakia, Estonia, Hungary, Latvia, Lithuania, Poland, Rumania, the USSR, the Russian Zone of Occupation of Germany and Russian Sector of Occupation of Berlin because the Secretary of the Treasury has determined "that there is no reasonable assurance that a payee in the areas listed will actually receive checks or warrants drawn against funds of the United States or agencies or instrumentalities thereof and be able to negotiate the same for full value."

This regulation is relied upon in Matter of Braier, supra, and Petition of Mazurowski, supra, for sustaining the actions of lower courts in refusing to send money to persons, in the first instance in Poland, and in the second instance in Hungary. In the Mazurowski case, the court estimated that the beneficiaries would receive 20 percent and the Government of Poland 80 percent of any cash transmitted. The documented testimony of the expert witnesses in the instant case fully supports these actions. It is our opinion that although testator gave his bounty to his brother and sisters, residents of the USSR, that he did not intend them to be used as pawns through whom the government of Russia would enrich itself at their expense so that they would receive little, if any, benefit under his will. However, were his intent otherwise, the Act of 1953, supra, would serve as a bar to immediate distribution. Claimants request, in the alternative, that pursuant to phrase (a) of section 2 of the Act of 1953, supra, the court exercise its discretion "to make payment of the share of such beneficiary at such times and in such manner and amounts as the court may deem proper", some immediate benefit be given them through the

appointment by the court of a master or other authority to distribute their share to them in small amounts either of money or of packages of food or clothing under supervision. The Commonwealth opposes this request and in our opinion its position is sustained by the record testimony.

In support of their request for distribution, claimants offered as an expert witness, Professor Harold Josef Berman, teacher of Comparative Soviet and American Law at Harvard University Law School and research associate and member of the executive committee of the Russian Research Council at Harvard University and author of four books on Soviet law. Mr. Berman also speaks and reads the Russian language and has visited the USSR at least twice in recent years. His testimony was almost devoid of documentation. He stated that private ownership of property exists in the USSR, that there is a money economy for work, royalties, prizes and income with rights of inheritance at home and abroad and that some people there are richer than others, the same as in the United States. His opinion is that while law is not permitted to thwart the power of the leadership, it is established and effective in most other areas of jurisprudence. He stated that the beneficiaries of this estate would, in his opinion, receive the actual benefit, use, enjoyment or control of small sums of money and property sent monthly within the regulations of the United States Department of Commerce which permit the sending of small packages monthly of a value of not more than $50 each.

Another witness for claimants was David Freedman, travel agent of the Globe Travel Service, one of several agencies authorized by Intourist, a branch of the Soviet Government to transmit packages to persons living in the USSR and elsewhere. He told of the procedures involved and that up to 1949 he sent on the

average two packages every two weeks, $500 to $600 annually, to these claimants, for which receipts were returned, and sent by him to testator. From 1949 to 1953 very few parcels were sent, but the practice was resumed in 1953 and continued until testator's death; that since early in 1958, such packages can be mailed by the United States Mail and are insured by the Post Office Department of the United States. He testified that his agency, like other similar ones, is required to register and to file semiannual reports with the Department of Justice.

Thomas V. Zug, trust officer, Provident Tradesmens Bank and Trust Company, executor under testator's will, testified that among testator's effects were rolls of cloth which he had previously purchased for shipment to his relatives in the USSR. The witness had these rolls of cloth packaged and sent through the Globe Travel Agency to the beneficiaries whose addresses appeared on cards in testator's possession. The witness followed this procedure after communicating with the beneficiaries, who requested their dispatch. He stated that he received letters from them acknowledging the receipt of the packages. The receipted bills for the transmittal of these packages indicate that the executor paid more than 100 percent of the value of the packages to the agency to cover Soviet customs duties. To illustrate, one bill for sending merchandise which cost $38.10 amounted to $83.18. This bill included the 10 percent USSR fee, $3.81, $19.05 customs duty, $1.50 inspection fee and several other charges.

To rebut this testimony, the Commonwealth presented as witnesses Dr. Vladimir Gsovski, Chief, European Law Division, Law Library of Congress since 1931, lecturer at Georgetown University, author of two volumes on Soviet Civil Law, Director of Mid-European Law Project, Editor of "Highlights of Mid-

European Law and Activities", Graduate University of Moscow, 1913, Law School University of Bratislava, 1926, and Leon M. Herman, Economic Analyst in Soviet Economy Service, Legislative Reference Service, Library of Congress since January 1, 1958, Chief of USSR Section on Foreign Commerce, United States Department of Commerce, November 1953 to December 1957, an economist by training, lecturer on and publisher of official documents of the Department of Congress. Both of these witnesses documented their testimony with citations from Soviet documents and text writers on political, economic and other phases of the Soviet Government and private sources. From their testimony, which is too voluminous to even review briefly, as well as from sources of which the court can take judicial notice, the following observations and conclusions are made concerning the political, economic and social conditions in the USSR existing behind the veiled facade of "the people's democracy."

The atheistical Communist program looks to the establishment of worldwide communism to be attained by revolution or other means. In the Communist concept the State is absolute and the citizen its creature, as distinguished from the United States where the power is in the people who are free and the government is their servant. There truth is based upon expediency involving ever-changing premises and conclusions like the ebb and flow of the tide. Thus their Constitution is merely, as Dr. Gsovski testified, a statement of policy, the provisions of which or of any other law are never permitted to thwart the purposes of the dictator or oligarchy ruling the country; that the Constitution has been amended several times by sources without authority to do so. Certainty of and due process of law, as we know it, do not exist there nor is there any separation of governmental powers. The rule of

law is a matter of convenience, not merely at the top, but practically throughout the country. There is no inhibition against ex post facto laws and precedents mean nothing. Much of their law remains unpublished either within or without the country. Whatever action officials believe will, in their opinion, serve the cause of communism is the controlling principle. There is always a law available to accomplish the desired end. While there appear expressions of civil liberties, personal property and personal ownership occupy the most remote area.

They follow the principle of dialectical materialism which consists of processes of alternate progress and retreat according to circumstances. In the economic field this is exemplified by Lenin's N. E. P. in 1922, which was repealed by Stalin, the adoption of incentive systems and of limited property holding, which vary in different areas and which are constantly subject to change, currency devaluations, high hidden taxes, including turnover taxes hidden in the prices of the most needed articles, which tax yields 40 percent to 60 percent of the national revenue, postponement in 1947 of the obligations on Government bonds held by the people in the amount of 253,000,000,000 rubles, thereby withdrawing 60 percent of the currency from circulation, that in 1950 it was authentically stated: "The use of personal ownership and property rights for obtaining an unearned income is not only unprotected by Soviet law, but is also prosecuted."

Phrases appearing in the Soviet lexicon such as "speculation", "parasitism", "production", "means of production", "socially dangerous", "crime by analogy" and "unjust enrichment" received interpretations which involve casuistries, distortions, ambiguities and contradictions, allowing for any convenient interpretation of officialdom, high or low. To illustrate, Dr.

Gsovski pointed out that parasitism is living on other than earned income. For this one may be subject to prosecution by his neighbors with a limited right of review by the local authority and if convicted may be sentenced to banishment of from two to five years. It is true that parasitism is not an offence throughout Russia today, but may appear at any time at any place.

Speculation is likewise given analogous treatment. Dr. Gsovski also cited the case of a man who brought a musical instrument, repaired it and sold it for a profit and was found guilty of some undefined offense and sentenced to banishment. He points out that the possibility exists that property received from the United States may be regarded as unjust enrichment and, therefore, confiscated and the possessor convicted and banished. Such matters as purges and banishment under the retained terroristic power of the Minister of the Interior do not require comment.

Emphasis is placed by these experts on the unreliability and untrustworthiness of Soviet law, customs and authority. It was stated that no one would have any assurance that any packages sent to the beneficiaries would reach them or if they did, that the recipient would have the benefit, use, enjoyment or control of them. Concerning the sending of currency, Dr. Gsovski said: "The restrictions of Soviet law regarding the use, enjoyment, benefit or control of monies sent from Pennsylvania are so numerous and indefinite it is reduced to a minimum." Every expert stated that all dollars transmitted to Russia must be deposited in the State Bank which distributes rubles in exchange to the beneficiary at arbitrary rates dictated by and mostly for the benefit of the government and minimally to the distributee. Presently the rate to these distributees is 10 rubles to the dollar. However, the purchasing power of such dollar thus converted, accord-

ing to Mr. Herman, for articles such as clothing, shoes and shirts, is the equivalent of two cents of its purchasing power in America. Mr. Herman stated that the records compiled by the Department of Justice from the report submitted by the transmitting agencies of packages to persons in the USSR demonstrate that the government of the USSR is directly receiving in duties, fees, etc., in excess of $2,000,000 annually. From this brief résumé the finding is inescapable that minimal benefits would flow to the distributees and maximum benefits to the Soviet Government and would be available for uses inimical to the United States were claimants' request granted.

To saddle a master or other court-appointed official with the responsibility of working out and executing plans for sending packages of food or clothing to the beneficiaries under the conditions above described would subject such person to intolerable burdens and responsibilities for the fulfillment of which the court would not want to hold him answerable.

The auditing judge is completely unimpressed with the testimony regarding the record of transmittals of thousands of packages to citizens of the USSR, inter alia, those sent by testator in his lifetime and by his executor after his death to these legatees. First, I do not know whether the people in the USSR actually received, retained and enjoyed the full benefit of these packages or what happened to the recipients if they did receive the packages. We must take judicial notice of the wholesale disregard of human and of property rights in the USSR and of the complete lack of morals, as we know them, pervading the operation of the Soviet system We are satisfied that the recipients might by fraud be represented as receiving these goods and, should the signatures on the receipts be genuine, they might have been obtained by coercion or mis-

representation. This conclusion is supported by the testimony of Dr. Gsovski that there is no reasonable ground to believe that the legatees would receive the packages, or if they would, that they would be permitted to use and enjoy them if the court awarded distribution in that manner. As against that it is clear that the Soviet Government will receive the maximum benefit from such procedures while the legatees' benefit would be minimal, if any.

The auditing judge finds as a fact that were the estate of testator distributed to the beneficiaries living in the USSR, that they would not receive the actual benefit, use, enjoyment or control of any money or other property distributable to them. He, therefore, rejects claimants' petition for distribution and awards the residue of the estate to the Secretary of Revenue for deposit in the State Treasury of Pennsylvania without escheat in accordance with section 2 of the Act of July 28, 1953, P. L. 674.

It should be noted that counsel presented a bill of costs amounting to $1,300 and request counsel fees on the basis of 25 percent of the amount distributable and calculated the percentage as a sum in excess of $13,000. In the amounts suggested, the requests are denied, but costs and counsel fees aggregating $2,000 are allowed and directed to be paid as above set forth. To refuse any payment would definitely be to deny due process of law.

The account shows a balance of principal of personal estate of $41,385.46
and a balance of income of 11,663.86

making a total balance of $53,049.32 . . .

Leave is hereby granted the accountant to make all necessary transfers and assignments.

456

And now, December 19, 1958, the account is confirmed nisi.