IOANNOU *v.* NEW YORK ET AL.

No. 191. Decided October 22, 1962.

*Sydney J. Schwartz* for appellant.

*Louis J. Lefkowitz,* Attorney General of New York, *Paxton Blair,* Solicitor General, and *Daniel M. Cohen,* Assistant Attorney General, for appellees.

PER CURIAM.

The motion to dismiss is granted and the appeal is dismissed for want of a substantial federal question.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I think this appeal presents substantial federal questions and that jurisdiction should be noted.

Under § 269 of the New York Surrogate's Court Act (now § 269–a) a Czechoslovakian beneficiary of a New York estate has been denied the power to make a gift of her interest in the estate to her niece residing in England. This result flows from a determination by the Surrogate's Court of Bronx County that under its present government conditions are such in Czechoslovakia that it is unlikely the beneficiary would be able to enjoy her interest. Therefore its use was denied her entirely, though none of it, so far as this record shows, will ever reach Czechoslovakia.

Czechoslovakia, though Communist, is a sovereign state recognized by the United States. The descent and dis-

tribution of property in one state to the citizens of another state is clearly a proper subject of international relations. See *Geofroy* v. *Riggs,* 133. U. S. 258. The Constitution by Art. I, § 10, imposes severe limitations on the several States' power to affect the foreign relations of the United States. "[C]omplete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states." *United States* v. *Belmont,* 301 U. S. 324, 331. Thus, if New York has, in effect, regulated an area of our international relations that should be regulated only by the Federal Government, or if the New York statute conflicts with existing federal policy, then that statute cannot be given effect. For "[i]f state action could defeat or alter our foreign policy, serious consequences might ensue. The nation as a whole would be held to answer if a State created difficulties with a foreign power." *United States* v. *Pink,* 315 U. S. 203, 232. Cf. *Brown* v. *Maryland,* 12 Wheat. 419.

Many areas of our law reflect the view that foreign policy can be shaped solely by the Federal Government. Our courts will not inquire into the validity of an act of a recognized foreign state (*Oetjen* v. *Central Leather Co.,* 246 U. S. 297), even though the act is attacked on the ground that it had been enacted by an unfriendly nation and is violative of United States public policy, *Bernstein* v. *Van Heyghen Freres S. A.,* 163 F. 2d 246; *Pons* v. *Republic of Cuba,* 294 F. 2d 925. Likewise, a foreign country is immune from suit for injuries caused in its commercial transactions (*Berizzi Bros. Co.* v. *The Pesaro,* 271 U. S. 562), even though this result is not required by international law (Restatement, Foreign Relations Law of the United States, proposed official draft, 1962, § 72). But, if the Executive Department of the Federal Government indicates its views on whether

immunity should be allowed, those views will control. *Republic of Mexico* v. *Hoffman*, 324 U. S. 30.

Admittedly, the several States have traditionally regulated the descent and distribution of estates within their boundaries. This does not mean, however, that their regulations must be sustained if they impair the effective exercise of the Nation's foreign policy. See Miller, The Corporation as a Private Government in the World Community, 46 Va. L. Rev. 1539, 1542–1549. Where those laws conflict with a treaty, they must give way to the superior federal policy. See *Kolovrat* v. *Oregon*, 366 U. S. 187. Yet, even in absence of a treaty, a State's policy may disturb foreign relations. As we stated in *Hines* v. *Davidowitz*, 312 U. S. 52, 64: "Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." Certainly a State could not deny admission to a traveler from Czechoslovakia nor bar its citizens from going there. *Passenger Cases*, 7 How. 283; *Crandall* v. *Nevada*, 6 Wall. 35; cf. *Kent* v. *Dulles*, 357 U. S. 116. The present restraints are not as gross an intrusion in the federal domain as those others would be. Yet they affect international relations in a persistent and subtle way. The practice of state courts in withholding remittances to legatees residing in Communist countries or in preventing them from assigning them is notorious. Chaitkin, The Rights of Residents of Russia and its Satellites to Share in Estates of American Decedents, 25 So. Calif. L. Rev. 297.

The issue is of importance to our foreign relations and I think this Court should decide whether, under existing federal policy and practice, the New York statute should be given effect. The issue was raised in No. 123, 1953 Term, where the appeal was dismissed. *In re Braier*, 305 N. Y. 148, 111 N. E. 2d 424, app. dism. *sub nom.*

*Kalmane* v. *Green,* 346 U. S. 802. JUSTICES BLACK, DOUGLAS, and BURTON voting to note jurisdiction. The question seems substantial and does not seem to be foreclosed by *Clark* v. *Allen,* 331 U. S. 503. We should note jurisdiction and ask the Solicitor General to file a brief.

A substantial question of due process is also tendered. In New York the Surrogate apparently holds no hearing but simply determines that any payments to or by people behind the "iron curtain" are barred by the statute. See *In re Geiger,* 7 N. Y. 2d 109, 164 N. E. 2d 99. But, as said by Judge Froessel (and Judge Fuld) dissenting in that case:

> "Had the Surrogate held a hearing, it might well have been developed, as alleged in the petition, that the beneficiaries are 'all of advanced age, who are [now] living [in Hungary] under difficult conditions and are in great need of assistance', and that monetary assistance 'can be transferred to them by sending food and clothing packages to each of them . . . free of duty and of any taxation'. It might well have been further developed that these nationals have no way of leaving Hungary; that they are the very victims of the 'events in Hungary' to which the Surrogate referred; that they will probably die there and never receive the benefit of their legacies if the moneys are withheld; and that there are agencies which can assure delivery of food and clothing packages in reasonable amounts to named individuals.

> "It seems to me that the Surrogate abused his discretion in failing to grant a hearing so that these facts might have been developed and the matter decided, not on the basis of an application to pay legacies to iron-curtain country nationals, but on the application as made, namely, to allow reasonable sums of money for conversion into food and clothing

packages upon a proper showing that they would reach the beneficiaries." 7 N. Y. 2d, at 113–114, 164 N. E. 2d, at 101–102.

This means that no one residing in Czechoslovakia may receive or make any disposition of property under a will probated in New York, even though it is done without the intercession of the foreign government or in fact without its knowledge, and even though there is no danger of the funds being confiscated or in fact being within Czechoslovakia's reach. If New York's purpose is to preclude unfriendly foreign governments from obtaining funds that will assist their efforts hostile to this Nation's interests, as *In re Getream's Estate,* 200 Misc. 543, 107 N. Y. S. 2d 225, and *In re Renard's Estate,* 179 Misc. 885, 39 N. Y. S. 2d 968, suggest, the complete prohibition of assignments made in those countries may have some basis in reason. But, if this is the purpose behind the statute, it seemingly is an attempt to regulate foreign affairs. If the statute is designed to effectuate the testator's intent, as appellees seem to argue, it would seem to have no basis in reason.

Viktoria Miculka, who was a distributee of an estate of a New York decedent, assigned at the American Embassy in Prague her interest in the estate to petitioner, her niece who lives in London. There is no connection between the fund in New York and Czechoslovakia because of the fact that Viktoria Miculka resides in Czechoslovakia. There is no evidence whatsoever that any of the funds will ever reach Czechoslovakia. Viktoria Miculka is an old woman who will probably never leave her homeland. An irrebuttable presumption that the testator would not have wanted his beneficiary to make a voluntary assignment of his interest under these circumstances flies in the face of reason and common sense and is as questionable as the one sought to be sustained in *Tot* v. *United States,* 319 U. S. 463.