## Struchmanczuk Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*James F. Lawler, Ostroff & Lawler, H. Ober Hess, Norman H. Brown, Ballard, Spahr, Andrews & Ingersoll,* for exceptants.

*Melvin E. Soll, Herbert W. Salus, Jr.,* special assistant attorneys general, contra.

KLEIN, P. J., April 17, 1968.—Semen Struchmanczuk died, intestate, November 5, 1964, a resident of Philadelphia. He was survived by a widow, Matrona Stakhovna Struchmanczuk, and a daughter, Slavka Struchmanczuk, also known as Yareslava Semenovna Stochanskaya, both of whom reside in Soviet Russia.

Because of the representation of counsel that conditions in Russia have changed materially in recent years, the court agreed to review its established practice of withholding distribution to Russian nationals under the provisions of the Act of July 28, 1953, P. L.

674, 20 PS §1156. This case was, therefore, considered to be in the nature of a test case and assigned to Judges Bolger and Saylor for hearing and determination. Many witnesses were heard at lengthy hearings held over a period of more than seven months.

In an adjudication filed December 2, 1967, the two auditing judges confirmed the identity of decedent's widow and daughter and authorized the administrator to transmit money in the amount of $250 to each of the two beneficiaries or to expend that amount in the purchase and shipment of merchandise to them. Upon receiving acknowledgment by the parties of the actual receipt of these shipments or payments, the administrator was authorized to make additional payments of like nature, no shipment or payment to be made until acknowledgment of the immediately preceding shipment or payment was received.

In short, instead of authorizing immediate payment of the distributive balance in the estate of approximately $11,000, as requested by decedent's widow and daughter, the administrator was authorized to forward the fund in periodic payments of $250 to each of them.

Exceptions were filed in behalf of the widow and daughter to the failure of the auditing judges to award the entire balance for distribution to them without restriction. Counsel contend that the court's action constitutes an unlawful preemption by the State of both the power to regulate foreign affairs and the power to regulate commerce with foreign nations, which powers are exclusively conferred upon the Federal government by article 1, sec. 10, and article 1, sec. 8, cl. 3, of the Constitution of the United States, respectively.

The Commonwealth of Pennsylvania filed exceptions to the restricted awards authorized by the auditing judges and contends that the entire balance for

distribution should have been paid into the State Treasury under the provisions of the 1953 statute.

In order to put the problem in proper perspective, it would be well to refer briefly to the historical events which led to the enactment of the 1953 statute.

With the advent of Communism in Eastern Europe, despotic dictatorships were established in Soviet Russia and the satellite nations under its domination. The tyranny which the leaders of these nations imposed upon their subjects was so cruel and inhuman that representatives of the United States Department of State warned American citizens not even to write to the nationals of these countries or attempt to send them money or packages, since the receipt of any communications from the United States might endanger the lives of the recipients.

Against this background, many States adopted legislation to protect from confiscation the funds left by American domiciliaries to their relatives living in the Soviet-bloc countries. These statutes were not uniform in nature, but all sought to safeguard the funds of the decedents.

The Pennsylvania Legislature passed the Act of July 28, 1953, P. L. 674, sec. 2, 20 PS §1156, which provides:

"Section 2.[1] Decree of Partial Distribution or of Payment Without Escheat.—Whenever it shall appear to the court that if distribution were made a beneficiary would not have the actual benefit, use, enjoyment or control of the money or other property distributed to him by a fiduciary, the court shall have the power and authority to direct the fiduciary (a) to make payment of the share of such beneficiary at such times and in such manner and amounts as the court

---

[1] Similar provisions for withholding distribution were incorporated in section 737 of the Fiduciaries Act of 1949.

may deem proper, or (b) to withhold distribution of the share of such beneficiary, convert it to cash, and pay it through the Department of Revenue into the State Treasury without escheat.

"Section 3. Custody of Funds in Commonwealth; Fiduciary Released.—Upon receipt of the money directed to be paid into the State Treasury the Commonwealth shall assume the custody of such money for the benefit of such beneficiary . . .

"Section 4. Repayment.—Any beneficiary or person, legally entitled to any money which has been paid into the State Treasury under the provisions of this act, may at any time petition the court which directed such payment into the State Treasury for repayment of the same. Upon proof to the satisfaction of the court of the petitioner's ownership of such money and that he will have the actual possession, benefit, use, enjoyment or control thereof, the court shall enter a decree directing the Board of Finance and Revenue to make an order for repayment, payable out of funds in the State Treasury appropriated for that purpose, with interest thereon at the rate of two percentum per annum from the date when the said money was paid into the State Treasury to the date of repayment thereof".

Relying upon a series of United States Supreme Court decisions, the Pennsylvania courts have under the provisions of this statute uniformly withheld payments from beneficiaries in the so-called Iron Curtain countries.

Let us examine some of these Supreme Court decisions.

In Clark v. Allen, 331 U. S. 503 (1947), the United States Supreme Court held, in an opinion delivered by Mr. Justice Douglas, that a California statute which conditioned the right of nonresident aliens to

acquire personal property on the basis of reciprocal rights in American citizens was not unconstitutional as an invasion by the State into the field of foreign affairs reserved to the Federal government.

In Kolovrat v. Oregon, 366 U. S. 187 (1961), the United States Supreme Court had before it a question arising under an Oregon statute which severely limited the rights of aliens not living in the United States to take either real or personal property or its proceeds in Oregon by succession or testamentary disposition. The statute provided that the right to take was conditioned upon the existence of a reciprocal right in United States citizens to take property in the same manner as citizens of the country of which the alien was an inhabitant or citizen and upon proof that such foreign heirs would receive the benefit, use or control of money or property from estates of Oregon decedents without confiscation by the governments of such foreign countries. The statute provided further that where the decedent died intestate and there were no next of kin except ineligible aliens, the property of the deceased should escheat to the State. In Kolovrat, two Oregon residents died without having made wills to dispose of personal property they owned in that State. Their only next of kin, who could have inherited this property under Oregon law, except for the fact that they were aliens, were the brothers, sisters, nieces and nephews of the decedents, who were all residents and nationals of Yugoslavia. The Supreme Court of Oregon held that the Oregon law barred these Yugoslav nationals from inheriting their relatives' property in Oregon. The United States Supreme Court reversed the Oregon court, holding that an 1881 treaty between the United States and Serbia, now a part of Yugoslavia, controlled and that the State policies as to the rights of aliens to inherit must give

way under our Constitution's Supremacy Clause to "overiding" Federal treaties and conflicting arrangements. *The Supreme Court, however, did not rule that the Oregon statute was unconstitutional in other respects.*

The question of the validity of such statutes was again presented to the Supreme Court in 1962, in Ioannou v. New York, 371 U. S. 30, in which a resident of Czechoslovakia assigned her interest in an intestate share of decedent's estate to a niece residing in England. The Surrogate's Court of Bronx County, N. Y., acting under the provisions of the New York Surrogate's Court Act,[2] dismissed a petition for an order directing the city treasurer to pay the share over to the assignee's attorney. The New York Court of Appeals affirmed without opinion: 11 N. Y. 2d. 740. The United States Supreme Court (371 U. S. 30 (1962)) dismissed an appeal in a per curiam opinion (Justices Douglas and Black dissenting) for want of a substantial Federal question.

This decision seemed to have placed at rest the question of the validity of statutes such as our 1953 Act if they did not contravene the provisions of treaties entered into by the United States with the countries of which the foreign beneficiaries were nationals.

In 1963, our Supreme Court, in Belemecich Estate, 411 Pa. 506, again involving Yugoslav nationals, upheld the validity of our statute. Mr. Justice Mus-

---

[2] This statute is similar to the 1953 Pennsylvania Act, which was patterned after it, and provides that where it shall appear that a legatee, distributee or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, a decree may direct that such money or property be paid into the Surrogate's Court for the benefit of such legatee, distributee, trust beneficiary, or such persons who may thereafter appear to be entitled thereto.

manno distinguished the Oregon statute from the Pennsylvania one in that the former was confiscatory, whereas ours was merely custodial. In discussing the nature of our statute, he said, at page 508:

"This Act carries the sobriquet of 'Iron Curtain Act' because its purpose is to protect the moneys, physically in America, but belonging to people who fatefully find themselves behind the Iron Curtain of Communism. It is a commendable and salutary piece of legislation because it provides for the safekeeping of these funds even with accruing interest, in the steelbound vaults of the Commonwealth of Pennsylvania until such time as the Iron Curtain lifts or sufficiently cracks to allow honest money to pass through and be honestly delivered to the persons entitled to them . . ."

The United States Supreme Court granted certiorari and reversed the judgment without opinion, solely upon the authority of Kolovrat v. Oregon, supra. *Again, nothing was said with respect to the constitutionality of such statutes.*

The Oregon statute came before the Supreme Court again recently, in Zschernig v. Miller, 389 U. S. 429. This case involved the estate of a resident of Oregon who died intestate, leaving to survive him as his heirs-at-law residents of East Germany. The Oregon Supreme Court held that under Clark v. Allen, supra, the heirs could take the decedent's Oregon realty by reason of article IV of the 1923 Treaty with Germany (44 Stat. 2132, 2135) but not the personalty. On January 15, 1968, Mr. Justice Douglas delivered the opinion of the court. Clearly, he and his colleagues have had a drastic change of heart, for they did a complete about-face and reversed the Oregon Court, in spite of the fact that the United States has no treaty with East Germany covering personalty left by an Ameri-

can citizen and passing to an East German national. Mr. Justice Douglas concluded that it is an intrusion by the State into the field of foreign affairs, which the Constitution entrusts to the President and the Congress. He said, inter alia, at pp. 440-41:

"It seems inescapable that the type of probate law that Oregon enforces affects international relations in a persistent and subtle way. The practice of state courts in withholding remittances to legatees residing in Communist countries or in preventing them from assigning them is notorious. The several States, of course, have traditionally regulated the descent and distribution of estates. But those regulations must give way if they impair the effective exercise of the nation's foreign policy. See Miller, The Corporation as a Private Government in the World Community, 46 Va. L. Rev. 1539, 1542-1549 (1960). Where those laws conflict with a treaty, they must bow to the superior federal policy. See Kolovrat v. Oregon, 366 U. S. 187. Yet, even in absence of a treaty, a State's policy may disturb foreign relations. As we stated in Hines v. Davidowitz, supra, at 64: 'Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government.' Certainly a State could not deny admission to a traveler from East Germany nor bar its citizens from going there. Passenger Cases, 7 How. 283; cf. Crandell v. Nevada, 6 Wall. 35; Kent v. Dulles, 357 U. S. 116. If there are to be such restraints, they must be provided by the federal government. The present Oregon law is not as gross an intrusion in the federal domain as those others might be. Yet, as we have said, it has a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems".

It also appears that the Supreme Court has changed its views with respect to Ioannou. At the time Zschernig was decided, the court also had before it an appeal in Goldstein v. Cox, 389 U. S. 581 (1968), challenging the New York statute on constitutional grounds on behalf of Rumanian heirs. This had begun as an action against the Surrogates of New York, Bronx, Queens and Kings Counties and the New York Comptroller, seeking to enjoin them from refusing to transmit the estate benefits belonging to plaintiffs. In connection with the action, plaintiffs moved in the United States District Court for a temporary injunction and asked for the convening of a three-man Federal statutory court. The district court denied the motion, in an unreported decision, and the United States Court of Appeals for the Second Circuit affirmed the order of the district court without opinion. A petition for a writ of certiorari was filed in the United States Supreme Court. On January 15, 1968, the Supreme Court, in a per curiam opinion, granted certiorari, vacated the judgment below and remanded the case to the United States Court of Appeals for the Second Circuit "for further consideration in light of Zschernig v. Miller . . ." On remand, the court of appeals reversed and remanded "for consideration of the constitutional issues by a three-judge court".

A comparison of the Pennsylvania legislation with the Oregon statute clearly indicates that the provisions of our act are much less stringent than those of the Oregon law. As Mr. Justice Musmanno pointed out, our statute is custodial in nature, whereas the Oregon statute is confiscatory. Nevertheless, under the mandate of Zschernig, we are constrained to hold that the Act of July 28, 1953, P. L. 674, and section 737 of the Fiduciaries Act of 1949, are unconstitutional, as an illegal intrusion by the Commonwealth of Pennsylvania into the field of foreign affairs, which

the United States Constitution entrusts to the President and the Congress.[3]

Having reached this conclusion, it is interesting to note the anomaly with which we are now faced. The Supreme Court of the United States has forbidden the States to withhold distribution of the estates of resident decedents to nationals of Communist countries with whom we have no treaties covering such distributions. At the same time, pursuant to authority vested in him under section 5 of Public Law 828, 54 Stat. 1086, 1087, 31 U. S. C. §127, the Secretary of the Treasury of the United States has placed such countries on a proscribed list forbidding the transmittal of United States Treasury checks or warrants on the basis that conditions in the countries are such that there is a reasonable doubt that the payee would receive the check, or, if he received it, that he would be able to negotiate it for full value. Czechoslovakia, East Germany and the Union of Soviet Socialist Republics are all included in this proscribed list.

The exceptions of the Commonwealth of Pennsylvania are dismissed, and the exceptions of Matrona Stakhovna Struchmanczuk and Yareslava Semenova Stochanskaya are sustained. The direction in the adjudication authorizing the administrator to transmit periodically $250 each to decedent's widow and daughter or the expenditure of that amount in the purchase and shipment of merchandise to them is rescinded, and the balance of principal, personal estate, with any income earned thereon, is awarded to Matrona Stakhovna Struchmanczuk and Yareslava Semenovna Stochanskaya outright, without restriction.

---

[3] Since the Zschernig case was handed down on January 15, 1968, probate courts in New York and Ohio have filed opinions invalidating similar statutes of their States. See Estate of Lehotsky, N. Y. Law Journal, Jan. 29, 1968, p. 18; First National Bank, Admr. v. Fishman, Probate Court, Hamilton County, Ohio, no. 2299.