[L. A. No. 28392. In Bank. Mar. 8, 1967.]

Estate of MAGDALENA CHICHERNEA, Deceased. ELEANORE G. SIOFLETEA et al., Petitioners and Appellants, v. STATE OF CALIFORNIA, Objector and Respondent.

Mosk & Rudman, Slaff, Mosk & Rudman and Edward Mosk for Petitioners and Appellants.

Thomas C. Lynch, Attorney General, and Elizabeth Miller, Deputy Attorney general, for Objector and Respondent.

TOBRINER, J.—In *Estate of Larkin* (1966) 65 Cal.2d 60 [52 Cal.Rptr. 441, 416 P.2d 473], we upheld the freedom of Californians to leave their estates to beneficiaries residing in the Soviet Union. We must decide today whether Californians who elect to do so may likewise leave their property to persons residing in Rumania.

Magdalena Chichernea died in Los Angeles on April 15, 1958. Her daughter, grandchildren, niece, and son-in-law, all of whom were named beneficiaries under her will, are citizens and residents of Rumania. They filed a petition to determine heirship on November 3, 1959. Opposing petitioners, the State of California sought to escheat the estate property to itself on the ground that the law of Rumania applicable at the date of death did not accord to United States citizens a "reciprocal right . . . to take . . . property upon the same terms and conditions" as its own nationals, a requirement embodied in Probate Code section 259.[1]

After holding hearings in 1964, the trial court rendered a decision against petitioners, refusing to enforce the decedent's will. Petitioners appeal. After a careful examination of the evidence bearing on the written law and actual practice of Rumania in matters of inheritance involving American citizens, we have concluded that Rumania, like the Soviet Union (see *Estate of Larkin, supra,* 65 Cal.2d 60), allows our citizens to inherit economically significant property interests on terms of full equality with its own citizens and residents. Accordingly, we hold that petitioners have established the reciprocity required by Probate Code section

---

[1]Section 259 conditions the validity of testamentary gifts to nonresident aliens "upon the existence of a reciprocal right upon the part of citizens of the United States to take . . . property upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are residents . . . ."

The statute contains two parts, identically worded but for the fact that one refers to personal property and the other to realty.

The nonresident aliens bear the burden of establishing reciprocity (Prob. Code, § 259.1); if they fail to do so, and if there are no other qualified takers, then the State may claim the property by escheat. (Prob. Code, § 259.2.)

259 and that the court below erred in deciding that it could not honor the decedent's wishes.

 [See fn. 2] Although section 1875 of the Code of Civil Procedure greatly facilitated the process by which our courts may enlighten themselves as to the laws of other nations,[2] proof of foreign law remains notoriously difficult, particularly

---

[2] At the time of trial, section 1875 of the Code of Civil Procedure provided that questions concerning the nature and content of foreign law constitute matters of law, regarding which our courts should take judicial notice. In discharging their responsibilities under the statute, courts were empowered to "resort to . . . appropriate books or documents of reference" and to consider "the advice of persons learned in the subject matter." (Stats. 1957, ch. 249, § 1; repealed by Stats. 1965, ch. 299, § 61, operative January 1, 1967.)

With changes not here pertinent, the new Evidence Code now embodies substantially the same provisions. (Evid. Code, §§ 310, 450-460; Stats. 1965, ch. 299, § 2, operative January 1, 1967.)

The Attorney General objected unsuccessfully to the admission in evidence of certain documents executed by authorities on Rumanian law on the ground that the documents in question were not authenticated in the manner required by Civil Code section 1183. Under that section, when an instrument is acknowledged by a notary public outside the United States, "the signature of the notary public must be proved or acknowledged before a minister, consul, vice consul or consular agent of the United States or a judge of a court of record of the country where the proof of acknowledgment is made." (Amend. Stats. 1963, ch. 144, § 1.)

We may assume, without deciding, that the requirements of section 1183 of the Civil Code apply without exception to the judicial notice provisions of former section 1875 of the Code of Civil Procedure (and to the corresponding provisions of the Evidence Code); we nonetheless conclude that the challenged documents were properly received in evidence.

The documents were acknowledged before a notary public; the signature and authority of the notary were established by the President of the High Court of the Capital of Rumania; his signature was in turn authenticated by the Rumanian Ministry of Justice; that signature was authenticated by the Ministry of Foreign Affairs; and the authenticity of the latter signature was certified by the American Vice Consul in Bucharest.

The Attorney General's only objection is that the American Vice Consul did not *directly* acknowledge the notary's signature and that the President of the High Court, who *did* directly acknowledge that signature, does not qualify under section 1183 since "nowhere does it appear that the High Court of the Capital of Rumania is a court of record."

In the present case, however, the signature of the notary public who acknowledged the disputed documents "purports to be the signature, affixed in his official capacity, of an officer . . . of a . . . public entity [the State Notary Office in Bucharest] in a nation recognized by the executive power of the United States," and the chain of acknowledging certificates ended with the statement of a "vice consul . . . in the foreign service of the United States stationed in the nation [Rumania], authenticated by the seal of his office." (Evid. Code, § 1454; Stat. 1965, ch. 299, § 2, operative January 1, 1967.) Evidence Code section 1454, although not strictly applicable to the present trial (see Evid. Code, § 12), indirectly supports the method of authentication here employed and confirms our conclusion that section 1183 of the Civil Code should not be given the restrictive reading proposed by the Attorney General. (Cf. fn. 35, *infra*.)

when the nation involved has not significantly attracted the attention of English-speaking legal scholars.

The trial court nevertheless heard the opinions of eminent authorities on Rumanian law and had before it the reported decisions of the highest Rumanian courts. The record is replete with references to, and quotations from, scholarly articles and texts, written in English, French, and Rumanian. The evidence adduced at trial included not only a wealth of learned opinion but also an imposing array of specific case histories.

I

The fundamental provisions of statutory law governing the right to participate in Rumanian estates are articles 654 and 655 of the Rumanian Civil Code[3] and the 1954 Decree Concerning Persons and Legal Entities.[4] Article 654 essentially eliminates remote vesting;[5] article 655 sets forth the only categories of persons excluded from sharing in a Rumanian estate; persons convicted of killing or attempting to kill the deceased; persons convicted of falsely accusing the deceased of a capital offense; and adult persons who concealed material information regarding the killing of the deceased.

The Decree Concerning Persons and Legal Entities defines "legal capacity" as "the ability to have rights and obligations"; it provides that "[a]ll persons are recognized as possessing legal capacity" and that "[t]heir sex, race, nationality, religion, education or origin, can have no influence on their capacity." Finally, it declares that "[p]ersons may be deprived of their legal capacity and the use thereof, in part or in full, only in the cases provided by Law."

Although these provisions do not purport to confer specific rights upon aliens (cf. *Estate of Larkin, supra,* 65 Cal.2d at p. 66), Rumanian jurists and scholars have uniformly treated Civil Code articles 654 and 655 as exhausting the requirements for participation in Rumanian estates;[6] taken

---

[3]Codul Civil, Text Oficial en Modificările pînă la data de 15 Iulie 1958 [Civil Code, Official Text with Modifications to date until July 15, 1958] (Scientific Publishing House, Bucharest, 1958).

[4]Decret nr. 31 din 30 Ianuarie 1954 [Decree No. 31 of January 30, 1954].

[5]Article 654 provides that "[i]n order to share in an estate an heir must be in existence at the moment of the decedent's death."

[6]The State's only witness testified that the Civil Code establishes a complete table of consanguinity, defining who may inherit and in what order. He was asked whether any Civil Code section provides "any

together with the 1954 decree, these articles of the Civil Code have been interpreted to preclude discrimination against foreign citizens in matters of inheritance.

Among the first authorities presented by petitioners was Professor Traian Ionascu, Director of the Institute for Juridical Research of the Rumanian Academy.[7] In his affidavit, Professor Ionascu testified that, in not excluding aliens from participation in Rumanian estates, the Civil Code proceeded upon an assumption which had long been implicit in Rumanian law: ". . . Rumanian Laws do not make *any* discrimination between . . . Rumanian citizens and . . . foreign citizens who do not live in Rumania. The whole juridical literature states that in Rumania . . . foreigners enjoy [full] equality with . . . Rumanian citizens as [regards] civil rights." (Italics added.)[8]

Professor Ionascu said that the Decree Concerning Persons and Legal Entities likewise reaffirmed the postulate, central to Rumanian jurisprudence, that aliens share the "civil capacity" of resident nationals. He quoted the early work of Professor D. Alexandresco, former Dean of the Juridical Faculty at Jassy University: "As to civil rights, the principal

---

indication that if [a] foreigner happens to be living in France or England or the United States, he does not take a share of the estate?" His response was an unqualified "No."

[7]Professor Ionascu is eminently qualified to testify regarding Rumanian law. He holds a Doctorate in Law from Jassy University in Rumania and a Laureate in Juridical Sciences from the University of Paris. He served as Vice President of the International Comparative Law Faculty at Strassburg and as President of the Civil Law Section of the Comparative Law Congress. He taught law in Rumania for over 40 years and, for the 22 years preceding the date of his deposition (1964), he had been a Professor of Civil Law on the Faculty of Juridical Sciences at Bucharest University. Since 1922, Professor Ionascu has published 85 major articles in leading Rumanian and French legal publications, including at least 10 important works in the past five years.

[8]Although the Rumanian Constitution of 1923 had imposed restrictions upon the right of aliens to acquire rural estates (art. 18), the Constitution of 1948, according to Professor Ionascu, abrogated all such restrictions. From that date [1948], [Rumanian] citizens and . . . foreign [citizens] have been enjoying the same . . . successional rights."

All of the writers are in apparent accord with this conclusion. Thus, for example, the recent work of A. Hilsenrad, D. Rizeanu, and C. Zirra, Notariatul de Stat [State Notary] (Bucharest, 1964) states: "With regard to the rights of inheritance of foreign citizens . . . one must proceed from the principle of full equality of rights and obligations of individuals, recognized by the laws of our country, without any discrimination, and [from] the principle: The right to inherit is the rule, and the incapacity to inherit the exception. In other words, in absence of any provision which limits the rights of foreigners, they are accorded, under conditions of reciprocity, the same rights as citizens of our country." (P. 244.)

Rumanian rule provides for legal capacity for the foreigner; incapacity is the exception. Foreigners enjoy all civil rights other than those from which they have been formally excluded."[9]

So deeply rooted is this principle, Professor Ionascu added, that Rumanian law "acknowledges the civil rights of a foreign citizen even if the Rumanian citizen does not enjoy the same rights in that [foreigner's] state."[10] It confers upon aliens the status of a "national regime"[11] with respect to civil rights generally and "successional rights" in particular, "even when . . . normative dispositions that are directly applicable in the matter are missing." The leading treatises and law school texts echo this basic conclusion.[12]

Professor Ionascu was asked specifically: "Do you know of any situations under the law of Rumania where a Rumanian citizen might inherit property but under the same circum-

[9]The quotation in the record appears in French: "Au point de vue des droits civils, la règle principale en Roumanie est la capacité de l'étranger; l'incapacité est l'exception. Les étrangers jouissent de tous les droits civils autres que ceux dont ils ont été formellement exclus." (D. Alexandresco, Droit Ancien et Moderne de la Roumanie (Louvain 1897) 30.)

[10]Thus the former Chief of the State Notary Office, the agency entrusted with Rumanian probate administration, wrote: "[O]ur [notarial offices] have asked both . . . foreign and . . . Rumanian citizens to [accept] their inheritance, [even] if in the respective foreign country . . . Rumanian citizens are [not accorded] successional rights. . . . The lack of reciprocity on the part of the foreign country has not diminished the foreigners' [inheritance] capacity on [our] territory." (N.H. Angelescu, *Exercitarea Dreptului de Optiune Successorală de Către Cetatenii Străini in Practica Notarială* [The Exercise of Successional Rights by Foreign Citizens in the Notarial Practice] (1960) 1 Justitia Noua [New Justice] 59.)

Rumania, like the Soviet Union, imposes a reciprocity requirement (see fn. 41, *infra*) which permits the unrestricted *transmittal* of funds only to those nations which likewise permit monetary transfers to Rumania. (Ebert, *Unele Probleme de Drept Successoral, în Lumina Dreptului International Privat Român* [Some Probate Problems in the Light of the Private International Law of Rumania] (1965) 10 Justitia Noua [New Justice] 60.) As is true of the analogous Soviet restriction, "[t]his reciprocity requirement is in the nature of a currency restriction and does not affect the vesting of interests." (*Estate of Larkin, supra*, 65 Cal.2d at p. 73, fn. 15.)

[11]The "national regime" concept, a familiar one in international law, characterizes the type of reciprocity which section 259 of our Probate Code requires, since it "connotes a situation in which a nation treats aliens on terms of equality with its own citizens." (*Estate of Larkin, supra*, 65 Cal.2d at p. 68, fn. 7.)

[12]M. Jacota, Curs de Drept International Privat [Course of International Private Law] (Bucharest, 1962) pp. 137-138: "In the Rumanian People's Republic . . . [t]he alien is granted a 'national regime.' . . . The equality of the alien with the citizen . . . is proclaimed not only

90

stances the Courts of Rumania would not permit a citizen of the United States to inherit the same property?'' He replied: ''No, I don't. Rumanian tribunals, as a matter of fact, *cannot* make any discrimination in this respect. *Our laws do not allow it* and if a tribunal would make such a mistake, the cause would be officially inquired into and the decision cancelled through the judicial superior channels. . . .'' (Italics added.)[13]

The record also contains the deposition testimony of Judge Ilie Stoenescu. Judge Stoenescu taught at the University of Bucharest as a Professor of Civil Law for 16 years. A judge for 35 years, he represented his country at the Hague Permanent Court of Arbitration and has served since 1948 as Judge of the Supreme Court of Rumania, the highest appellate tribunal of that nation.

Judge Stoenescu testified that in his long service on the bench, he had occasion to pass upon many inheritance matters involving aliens. Not once in his entire experience was the foreign nationality of such aliens so much as *suggested* as a possible bar to their inheritance rights in Rumania. The judge explained that, although Rumanian law had undergone major changes in recent years, the laws of succession and inheritance had remained essentially unaffected since the enactment of the Civil Code of 1864, which was itself patterned closely upon its French predecessor of 1810. Once aliens had been assimilated into a ''national regime'' in the nineteenth century, a presumption developed that, absent express limitation, aliens and nationals were equal before the law. Against this background, Judge Stoenescu said, ''if the Rumanian [Legislature] would have wanted to restrain the . . . capacity of . . . aliens [it] would have done [so] in an express way. Since there is no restrictive text . . . aliens continue to enjoy, as well as . . . nationals, the fullness of their civil rights, [including] the right to accept successions . . . on Rumanian soil. *As an old practitioner, I repeat that no exception has ever been raised in this respect.*'' '' [S]uccessional

formally, but . . . is truly guaranteed in all domains, in the same measure as [for] the Rumanian citizen.''

T. Popescu, Curs de Drept International Privat, Partea I [Course of International Private Law, Part I] (Bucharest, 1955) ch. 3, § 35A, p. 83; ''As regards the rights extended to aliens, the laws of the Rumanian People's Republic assimilate them to [those of] Rumanians . . . . Our law acknowledges as a rule the . . . equality [of foreigners] even if they belong to capitalist countries.''

[13]Professor Ionascu testified that his statements would be equally applicable throughout the period 1958-1963. (See also fn. 15, *infra*.)

rights," he concluded, "[have] *never* . . . been denied before [Rumanian] courts . . . to aliens on the ground that they are aliens." (Italics added.)

The trial court heard the views of respected members of the bar as well as of the bench. Lazar Focsaneanu, an attorney with Coudert Frères (the Paris office of a well-known New York law firm), was a practicing member of the Bucharest bar from 1925 to 1948, and was a Barrister at Law in the Supreme Court of Rumania for 20 years.[14] His years of experience and study led him to conclude that "[a]s regards the legal ability to inherit property in Rumania no distinction is made between a citizen of Rumania and a resident and citizen of the United States." Like Professor Ionascu, he was asked directly whether he knew of any situation under Rumanian law in which a Rumanian citizen but not an American citizen might be permitted to inherit; like Ionascu, he responded with a categorical "No." If statutory support were needed for so elementary a proposition, he said, the 1954 Decree Concerning Persons and Legal Entities would supply it.[15]

The only English text dealing with Rumanian inheritance law suggested by either party in this case was a book published in Holland in 1961, "Law in Eastern Europe."[16] The section on Rumanian inheritance law was written by Virgiliu Stoicoiu, former member of the Bucharest bar and a specialist in European law for the United States Library of Congress. He interpreted Civil Code articles 654 and 655 and the 1954 Decree Concerning Persons and Legal Entities to mean that "an alien is not excluded from the inheritance of a deceased Roumanian." (P. 244.) Dr. Stoicoiu, conceded by the State's only witness[17] to be an expert on inheritance law in Rumania,

---

[14]Focsaneanu is a Professor of International Law and International Organizations at the Institute of Political Science, University of Aix-Marseilles. He received advanced degrees in law and in economics from the University of Bucharest, the University of Paris, the French Institute of Political Science, and the Hague Academy of International Law. He has written numerous articles on Rumanian law and on international legal problems, published in the Rumanian Review of Royal Foundations and in various French journals.

[15]Focsaneanu, like Ionascu (see fn. 13, *supra*), said that his views applied to the entire period 1958-1963.

[16]Edited by Z. Szirmai, the work contains a series of publications issued by the Documentation Office for East European Law, University of Leyden.

[17]The State of California offered the testimony of George Crisan, a lawyer with the General Services Administration of the federal govern-

stated categorically: "The law does not make any distinction between the rights of citizens and aliens." (P. 228.)[18]

## II

If there were any dissent from the views held by this massive array of scholars, jurists, and practitioners, surely an opposing expert would have found at least one example of such dissent and would have employed that example to rebut the petitioners' showing of reciprocity. But when asked whether any such dissenting opinion existed, the only witness called by the Attorney General could think of none.[19] Nor could the State's witness himself suggest any post-1948 law,[20] substantive or procedural, which expressly restricted the right of foreigners to inherit property in Rumania. Although he discussed two specific statutes, the 1941 Law on Control of Foreigners' Acts of Disposition[21] (hereinafter

ment. He was born in Rumania and was admitted to the Rumanian bar in 1930; he practiced law there until 1948. He testified that he was unfamiliar with post-1948 Rumanian probate procedure. After coming to the United States, he was ordained a minister and later acquired a law degree at George Washington University. He worked for the Library of Congress translating summaries of Rumanian law for four years, but his employment since 1959 bore no relationship to foreign law. He has written no articles on legal subjects since 1956 and has never written on the subject of inheritance in Rumania, but he was employed by the State to engage in a study of that subject in preparation for his testimony. Before commencing his study, he had expressed the opinion that Rumanian law probably discriminates against foreigners in matters of inheritance.

[18]See also Hilserad and Stoenescu, R.P.R. Procesui Civil [The Civil Suit in the Rumanian People's Republic] (Bucharest, 1957) 26. The State's witness was shown a quotation from this work; he translated it to mean that Rumanian law tolerates no discrimination against foreign citizens. The witness conceded that the book was "the manual for judges" in Rumania.

[19]"Q. Do you know of any writer in the English language who has specifically stated in so many words that there are distinctions between Rumanians and foreigners under the law of Rumania?

"A. I didn't look for that.

"Q. Do you know of any writer in the Rumanian language who has ever made that categorical statement?

"A. No, I don't think so. I don't recall."

" · · · · · · · ·

"Q. . . . Do you know of any expert . . . of *any* country who has stated that foreigners do not have equal rights with Rumanian citizens in matters of inheritance?

"A. Only by assimilating Russian rights, if there is, but not specifically. Let's say No, I cannot recall. I have read considerable law journals and I follow Mr. Bergman Hauser and some other people, but they did not point to Rumania, as such, no."

[20]See footnote 8, *supra*.

[21]Legea nr. 169 din 4. III. 1941 [Law no. 169 of March 4, 1941]. (See pp. 32-42, infra.)

referred to as the 1941 Disposition Law) and the 1950 Decree on Land Pool and Transfer of Agricultural Property[22] (hereinafter referred to as the 1950 Land Pool Decree), he ultimately conceded that nothing in the 1941 Disposition Law related to the right of foreigners to *inherit*,[23] and that no provision of the 1950 Land Pool Decree distinguished between foreign citizens and Rumanians.[24]

---

[22]Decret nr. 151 din 10 Iunie 1950 [Decree no. 151 of June 10, 1950].

[23]"Q. Mr. Crisan, would you look at Exhibit 27. That is the 1941 Act which you referred to at length on direct examination. Now I understand that you feel that this Act is very important in your belief that there is no reciprocity between the United States and Rumania?

"A. It is important.

"Q. Would you tell me what is the relationship between this act and the principle of reciprocity?

"A. I don't know.

"Q. Well, let me be more specific. Can you tell me anything in this act that relates to the right of foreigners to inherit. Let's put it the other way around, the right of Rumanians to leave property to foreigners?

"A. The specific act does not relate to such a thing."

[24]The 1950 Land Pool Decree imposed requirements of prior administrative approval upon the transfer of agricultural lands but provided an exemption in Article 9 for acquisition of agricultural property through inheritance "between relatives of direct line or collaterals up to and including third degree as well as between spouses." (Translation furnished by Mr. Crisan.)

Mr. Crisan offered in evidence an article containing the following language: "Bine înteles ca aprobarea se cere numai daca beneficiarul testamentar este un strain ori rudă în gradul 4 sau mai îndepărtat." (P. Jurca, *In Legatura cu Dispozitiile Art. 9 din Decretul 151/1950* [*In Connection with the Provisions of Article 9 of Decree 151 of 1950*] (1958) 14 Justitia Noua [New Justice] 248.)

Mr. Crisan translated the preceding sentence as follows: "This approval [the administrative approval required by the 1950 Land Pool Decree] is required only when the beneficiary under the will is a *foreigner* or a relative beyond the third degree." (Italics added.)

In cross-examination, *Crisan conceded that the language of the decree itself makes no reference whatever to foreigners.* He conceded that, although he had translated the word "strain" in Jurca's article to mean "foreigner," the word could properly have been translated as "stranger to the blood." He admitted that his decision to read the word as "foreigner" rather than as "stranger" ran contrary to his own interpretation of the decree. Finally, he acknowledged that, if the article were read as he had read it in his translation, and if the article, thus translated, correctly construed the 1950 Land Pool Decree, then that decree would imply that foreigners *may* inherit Rumanian land under some circumstances, a conclusion entirely at odds with his own earlier testimony that, in his opinion, foreigners were absolutely prohibited from succeeding to Rumanian land. Crisan's only explanation for the inconsistency was that "there is by necessity a confusion of many things and probably would be that forever . . . ."

It is clear that if one were to translate "strain" as "stranger," then the quoted language of the article would become consistent with the statutory text and with the next paragraph of the article by Jurca, which Crisan translates as follows: "Consequently, by the provisions of Article

The State's witness testified that he nonetheless believed that Rumanian law discriminates against foreigners. He explained that he predicated this conclusion on his opinion that Rumanian legal theory recognizes no "implied" or "inherent" rights, i.e., rights which have no explicit foundation in statutory or constitutional language, but which all men nonetheless presumptively enjoy. At one point he testified that rights in Rumania must be specifically expressed by statute. Elsewhere, however, he insisted that only the Constitution could confer rights in Rumania, and that no statute could possibly do so. At yet another point in the record, after it had been clearly established that aliens and nationals were given equal access to Rumanian courts,[25] the witness was asked whether "any law, Constitutional provision, or decree [gives] United States citizens an *express* right to appear in any one of these courts?" (Italics added.) He replied in the negative, and was then asked: "In your opinion does the absence of any express grant of a right mean that they have no right?" Somewhat inconsistently with his basic position, he replied: "No, they may appear in court."

Whichever of these several contradictory views of the State's witness we might attribute to the Attorney General, their relevance to our inquiry is at best unclear. If the Attorney General simply means to suggest that "inherent rights" or "natural rights" are not recognized under Rumanian law, then his position will not avail him here, for we concluded in

9 of [Decree] No. 151 of 1950, the legatee under the will who is *not related to the deceased, or who is related in the fourth degree or above,* besides the conditions he must satisfy under Articles 654 and 655 of the Civil Code, also must meet the third condition of the approval by the Ministry or by the People's Council." (Italics added.)

If, on the other hand, the word "strain" were taken to mean "foreigner," and if the 1958 article by Jurca, thus construed, properly interpreted Article 9 of the 1950 Land Pool Decree, then it would follow that the 1950 decree was abrogated by the 1954 Decree Concerning Persons and Legal Entities (see fn. 4, *supra*), since the provisions of Article 9 of the 1950 Land Pool Decree constitute restrictions upon the "legal capacity to inherit" (P. Jurca, *op. cit. supra*, 14 Justitia Noua [New Justice] 248), and the 1954 Decree Concerning Persons and Legal Entities clearly stated that "nationality . . . can have no influence on [legal] capacity."

It seems clear, therefore, that what might otherwise have appeared to be a discrimination against foreigners was in truth a simple mistranslation by the State's witness. Indeed, when he was asked whether he could suggest any statutory justification for his translation, he replied: "I didn't think about that." Pressed further, he admitted that he had been searching for material which would support his view that foreigners could not inherit under Rumanian law.

25See, e.g., M. Jacota, *op. cit. supra*, pp. 137-138.

*Estate of Larkin, supra,* 65 Cal.2d at page 81, that the failure of a nation to ground its system of inheritance on the philosophy of "natural rights" does not prejudice the existence of the reciprocity required by Probate Code section 259.[26]

If the Attorney General intends instead to advance the proposition that rights not expressly secured by the Rumanian Constitution and laws constitute mere "privileges" which the regime may choose to ignore in any given case, then our problem is a different one, but it is not more difficult. We note initially that the proposition is of dubious accuracy as a statement of Rumanian law. Every expert whose views were before the trial court recognized that certain traditional rights, though not grounded in any express provision of written law, nonetheless receive full protection in Rumania.[27]

---

[26]As we noted in *Estate of Larkin, supra,* 65 Cal.2d at page 72, footnote 13, all "civil law" nations reject the concept of rights "inherent" in the nature of man. (See Schlesinger, Comparative Law (1959) 174-198.)

[27]Moreover, even if it were true that rights not directly expressed in the Rumanian Constitution rest upon the government's capricious or sporadic recognition, it would not follow that foreigners have no right to inherit Rumanian property. Although the State's witness insisted that the Rumanian Constitution does not in terms protect the inheritance rights of foreigners, that proposition is open to serious question.

Article 12 of the Constitution of the Rumanian People's Republic of September 27, 1952 (as amended) provides: "The personal property right of the citizens of the Rumanian People's Republic as to earnings and savings from personal labor, a dwelling house and subsidiary home enterprise, articles of domestic and personal use, *as well as to the right to inherit personal property from citizens,* is protected by law." (Italics added.) As the State's witness noted in this connection, "personal property" in Rumania encompasses much of what we would call real property, including dwellings and certain other structures but excluding "means of production."

Similarly, Article 81 of the Constitution provides that "citizens of the Rumanian People's Republic, *irrespective of their nationality* . . . are ensured full equality of rights in *all* spheres of economic, political and cultural activity." (Italics added.)

The State's witness repeatedly *asserted* that Articles 12 and 81 were intended to govern only Rumanian nationals and that the concept of "citizens of the Rumanian People's Republic," recurring in both sections, was not broad enough to encompass aliens. Most of the pertinent evidence in the record, however, points to a contrary conclusion. The treatise written by Professor Tudor Popescu construes Article 81 as prohibiting any discrimination against aliens (T. Popescu, *op. cit. supra,* pp. 81-83), as does the Judges' Manual of 1957 (Hilserad and Stoenescu, *op. cit. supra,* p. 26). Professor Ionascu explained that the word "citizen" was used in Articles 12 and 81 "without reference to the political relation between a person and a determined state." Rather, it was used to signify what the word "citoyen" had signified "during the French revolution of 1789, when it was [synonymous with] 'man.' " Consequently, "[t]he civil rights of . . . aliens are . . . implicitly consecrated

If such protection should later be withdrawn with respect to inheritance by aliens on the theory that the underlying "rights" were not embodied in any specific section of the Constitution or Civil Code, our courts will have ample time and opportunity to prohibit the further participation of Rumanian citizens and residents in California estates. (Cf. *Estate of Larkin, supra,* 65 Cal.2d at pp. 82-83.)

Just as we have held that the reciprocity demanded under our Probate Code may be negated by proof that a nation denies in practice the equal inheritance rights it confers in theory (see *Estate of Schluttig* (1950) 36 Cal.2d 416, 423 [224 P.2d 695]), so we have held that proof of a nation's actual practice may suffice to establish reciprocity despite the absence of any explicit guarantee of equal treatment in the language of that nation's laws (see *Estate of Larkin, supra,* 65 Cal.2d at p. 75.) Underlying both of these rulings has been the realization that Probate Code section 259 seeks only to prevent the passage of California property to the residents of nations which *in fact* discriminate against our citizens in their inheritance laws, either on their face or as applied; our statute is concerned not with the brooding omnipresence of foreign law but with its specific provisions and their operation in concrete situations.

Thus the dispute over the precise jurisprudential status of the "right" of aliens to share in Rumanian estates is one which we need not resolve; nor need we engage in the complex and necessarily speculative examination of the theoretical underpinnings of such nondiscriminatory treatment as Rumania may accord our citizens in actual practice.[28] Having determined that the laws of Rumania contain no provisions

---

by the Constitution of the Rumanian People's Republic . . . ." "For this reason," he added, "the literature concerning the private international law of the Rumanian People's Republic invokes the Constitutional text as a main source when referring to the equality between Rumanians and aliens as to their civil rights." He concluded: "Since article 12 of our Constitution stipulates, among other things, the right to inheritance of personal property and as this belongs to civil rights, we infer, in the spirit above mentioned, that our Constitution is referring to . . . alien citizens too, who are considered as Rumanian citizens, enjoying equal rights as to . . . succession . . . ."

Although the State's witness referred to journal articles allegedly supporting his narrower construction of Articles 12 and 81, an examination of the translations of those articles which he supplied in exhibits submitted to the trial court reveals no reference whatever to the meaning of the term "citizens" as used in any provision of the Rumanian Constitution.

[28] See Recent Cases (1967) 80 Harv.L.Rev. 675, 676-677 & fns. 7-11, 678 & fn. 13.

discriminating against citizens of the United States in matters of inheritance, we need only determine whether those laws are applied even-handedly. Accordingly, we turn to the evidence bearing upon the application of Rumanian law to actual cases of alien inheritance.

## III

The record is replete with case histories illustrating Rumanian inheritance practice in matters involving American beneficiaries. Professor Ionascu furnished several examples of Rumanian estates in which United States citizens had inherited substantial sums of money; further instances were set forth by N. H. Angelescu; and Judge Stoenescu likewise cited numerous cases which confirmed his conclusion that citizens of the United States could inherit from Rumanian estates on terms of full equality with Rumanian citizens and residents.

Although no Rumanian court has been called upon to adjudicate a direct challenge to the inheritance rights of aliens,[29] decisions of Rumanian courts involving other aspects of inheritance law furnish indirect support for the conclusion that Rumanian law, far from discriminating against non-resident aliens, is surprisingly solicitous of their interests.

The most recent such decision, *Estate of Milidi* (1960) Sențintei civile nr. 1825/960 a Trib. T. Vladimirescu dosar 1744/960 [Civil Judgment no. 1825/1960 of the People's Court of Justice of the Ward of T. Vladimirescu, file no. 1744/1960], involved a dispute between a New York resident, John Mili, and his Rumanian brother and sister, over the land and house which comprised the estate of their mother, Victoria Milidi, who had died in Bucharest in May 1959. Although the State Notary office waited for nearly three months before sending Mili notice of his mother's death, it measured the six months within which he was required to file a claim against the estate[30] not from the date of notice but from the date of death. Through a Bucharest attorney, Mili brought suit in a local court, demanding an extension of time. In March 1960 the court ruled in Mili's favor and ordered the proper notarial officers to entertain his claim, holding that Mili's

---

[29]As Judge Stoenescu explained, Rumanian courts have simply *assumed* that an alien's foreign nationality and residence could have no bearing upon his status as an heir to a Rumanian estate.

[30]Decret nr. 40 din 22 Ianuarie 1953 (art. 24) [Decree no. 40 of January 22, 1953 (art. 24)].

failure to file within six months was excused by "the objective circumstance that the petitioner resides abroad and . . . [could not] be aware of the death [until the summons was issued by the State Notary Office]."[31]

In another illuminating case, *Estate of Palade* (1956) Decizia nr. 814 din 27 Aprilie 1956 a Colegiului Civil al Tribunalului Suprem al R.P.R. [Decision no. 814, April 27, 1956, of the Civil College of the Supreme Court of the Rumanian People's Republic],[32] Aurelia Sibrecht, a citizen of the United States domiciled in Ohio, learned that her son, a Rumanian citizen, had disappeared during the Second World War. The mother failed to assert her claim within six months and, since there appeared to be no other qualified heirs, the State Notary Office certified that the son's estate was vacant and declared that the State was entitled to escheat the property. Through her brother in Rumania, the mother brought suit in a local court to cancel the certificate of vacancy. The court rejected her plea, ruling that she had advanced no sufficient justification for her delay, and a regional court dismissed her appeal as groundless. She then instituted a new action in the local court which had initially rejected her claim; when she lost there, she again appealed to the regional court without success. This time, however, the Supreme Court of Rumania reversed the regional court's decision. It held that the mother had tacitly asserted her claim within the six-month period by filing a petition asking that the presumed death of her missing son be made official. That act, the Supreme Court reasoned, left no doubt of her intention to accept her share of her son's estate. In any event, the court said, the six-month period should have been extended since the mother, having settled permanently in the United States, was "hindered by a cause of major proportions to avail herself of her right to accept the succession."[33] On

---

[31]The State Notary Office complied with the court's mandate, and on January 27, 1961, it issued Mili a Certificate of Inheritance (no. 293/1960), vesting him with legal title to a one-third share in an estate consisting of "a parcel of land the size of 250 square meters . . . with the buildings thereon erected."

[32]Culegerea de decizii ale Tribunalului Suprem al R.P.R. pe annul 1956, vol. I [Collections of Decisions of the Supreme Court of the Rumanian People's Republic for the year 1956, vol. I] (Bucharest, 1958) 336.

[33]We note that the Rumanian court here was considerably more sympathetic to the plight of the American heir than was the Soviet court in *Sikora* v. *Cherkashina* (Presidium of the Supreme Court of Byelorussian S.S.R. 1957) Byulleten Verkhovnogo Suda S.S.R. [Supreme Court Bulletin] 42, discussed in *Estate of Larkin, supra,* 65 Cal.2d at pp. 78-79. In

remand, the lower courts considered the mother's claim on its merits and declared her the lawful heir.[34]

The fact that none of the courts involved in these cases, including the local and regional courts whose decisions were ultimately reversed in *Palade*, expressed any doubt as to the right of aliens to inherit property in Rumania, and the fact that the courts felt no need to identify any special source of authority as the foundation of such a right, strongly confirms the conclusion that, as a matter of actual practice, Rumanian inheritance law fully equates the rights of aliens with those of Rumanian citizens and residents.

Nor need we search the reported decisions of Rumanian courts for such confirmation. Probate matters in Rumania, like those in the Soviet Union (see *Estate of Larkin, supra,* 65 Cal.2d at p. 78), are ordinarily processed by the Notary Offices; such matters reach the courts only if one of the parties is dissatisfied with a notary's ruling. Thus, in the great majority of cases, United States citizens have been able to establish the validity of their claims against Rumanian estates without recourse to the courts.

Müller Petru, for example, filed a claim with the State Notary Office in Timişoara, a county in Rumania, upon learn-

---

*Sikora*, a nonresident heir of a Soviet citizen failed to assert her claim within the six months required by law, and the notary rendered an adverse judgment. The foreign heir sued in a local Soviet court to set aside the action of the notary. When that court rejected her plea, she appealed to the regional court, which ruled in her favor. The Civil Division of the Supreme Court of the Byelorussian S.S.R. reversed, and the Attorney General sought review on plaintiff's behalf in the Presidium of that court, which refused to reverse, holding that, ''[t]he fact that one of the heirs is an alien or that the heir lives abroad does not, in itself constitute sufficient grounds for extending the delay of six months granted by law for accepting the succession.''

Although the Presidium ruled *against* the alien, we noted in *Larkin* that its willingness to consider her claim without questioning her right to participate in a Soviet estate afforded ''significant confirmation of the view that the inheritance rights of aliens in the Soviet Union have never been doubted.'' (*Estate of Larkin, supra,* 65 Cal.2d at p. 80.) Since the Rumanian court ruled in *favor* of the American citizen in *Estate of Palade*, and did so on facts remarkably similar to those of *Sikora*, it follows that the action of the Rumanian Supreme Court in *Palade* must be viewed as highly persuasive evidence for the proposition that Rumanian inheritance law does not favor Rumanians over Americans. Indeed, *Palade* even suggests that the favored heirs might be those from the United States. As Professor Ionascu testified, foreigners have apparently been ''dealt with more leniently and understandingly than Rumanians in similar cases.''

[34]Acting on her behalf, her brother sold the property which she had thus inherited; on May 26, 1959, the National City Bank of Cleveland received the proceeds of the sale from Rumania and forwarded the sum of $1,166.33 to Mrs. Sibrecht.

ing that his mother had died in that county in January 1958. No other heirs appeared, and in December the Notary Office issued Petru a Certificate of Heirship, naming him the lawful owner of a small house which had belonged to his mother. Corresponding with a Rumanian attorney, he arranged to sell the house; in September 1959 a Rumanian farmer purchased it and deposited the price with the State Bank of Rumania for transmittal to the United States. In June 1960 the First National Bank of Chicago received the proceeds of the sale from Rumania and remitted the sum of $824.67 to Petru. It is noteworthy that the Certificate of Inheritance (No. 458/1960) identified the heir simply as "Müller Petru, citizen of the United States of America, son of the deceased."

The list of such examples could be greatly expanded.[35] To the entire list, the State's witness responded with the wholly unsupported speculation that all of the American beneficiaries named in Rumanian Certificates of Inheritance could have come to this country from Rumania and that the State Notary Office might have treated all such former Rumanians, including those who had become citizens of the United States, as though they had retained their Rumanian citizenship. Failing that, the State's witness could only conclude that the State Notary Office had consistently erred in certifying nonresident aliens as lawful heirs to Rumanian estates.

We find neither hypothesis tenable. The argument that American beneficiaries might have been regarded as citizens

---

[35]The record contains Notarial Certificates of Inheritance in favor of domiciliaries of California, Illinois, Indiana, Maryland, Michigan, Minnesota, New Jersey, New York, Ohio, Pennsylvania, Washington, D.C., and Wisconsin. The Americans involved inherited a great variety of property interests, ranging from substantial amounts of cash to a 25,000 square meter farm, complete with "2 horses, 2 coaches, a plough, a rake, [and] a wheel barrow." (Certificate No. 295/1961.)

On occasion, the certificates specify that the heirs in question are American citizens. (See, e.g., Certificate No. 182/1959: "Julliand Aurica Ileana Maria, decedent's daughter—alien citizen, domiciled at Philadelphia U.S.A.") More commonly, however, they make no mention of the nonresident heir's nationality, a fact which tends to confirm Professor Ionascu's observation that Certificates of Inheritance are issued without regard to questions of nationality or citizenship.

The Attorney General challenges the sufficiency of the authentication of the notarial certificates discussed herein. The challenge does not differ significantly from that which we disposed of above (see fn. 2, *supra*), save that many of the certificates were *copies* rather than originals, creating a further level of evidentiary difficulty. We are satisfied, however, that Code of Civil Procedure sections 1905 to 1907 (repealed by Stats. 1965, ch. 299, §§ 71-73, operative January 1, 1967), which govern proof of foreign judicial records in trials beginning before January 1, 1967 (see Evid. Code, § 12), furnish a complete answer to this aspect of the Attorney General's argument.

both of Rumania and of the United States cannot stand in light of the fact that Rumanian law does not recognize the existence of dual citizenship,[36] and the speculation that Rumanian notarial officers simply ignored the laws of their country in issuing certificates of heirship to nonresident aliens flies in the face of the presumption that "official duty has been regularly performed"[37] and is irrelevant in any event since we are here concerned only with the actual practice of Rumanian officials.

## IV

The Attorney General necessarily concedes here, as he did in *Larkin*, that he has been unable to discover a single instance in which Rumania has denied equal inheritance rights to a United States citizen or to any other alien. Nor does the Attorney General seriously suggest that the property interests recognized by Rumanian law and hence inheritable by American heirs to Rumanian estates are so limited in number or value as to be "economically negligible" within the test suggested by *Larkin*. (*Estate of Larkin, supra,* 65 Cal.2d at pp. 65, 84-87.)[38] Given the overwhelming evidence establishing the absence of discrimination, our inquiry would thus be at an end but for the fact that the Attorney General here stresses a facet of the reciprocity problem which was not before us in *Larkin*.

[36]Decret nr. 296, pentru modificarea art. 1 din Decretul nr. 33 din 24 Ianuarie 1952, privitor la cetatenia Republicii Populare Romîne [Decree no. 296 for the modification of article 1 of Decree no. 33 of January 24, 1952, regarding citizenship of the People's Republic of Rumania], published in Buletinul Oficial al Marii Adnuari Nationale a Republicii Populare Romîne, Nr. 38, 9 August 1954, Anul III [Official Bulletin of the Grand National Assembly of the Rumanian People's Republic, No. 38, August 9, 1954, Year III] 323.

[37]Formerly embodied in section 1963, subdivision 15, of the Code of Civil Procedure (repealed by Stats. 1965, ch. 299, § 109, operative January 1, 1967), this presumption is now codified in section 664 of the Evidence Code (Stats 1965, ch. 299, § 2, operative January 1, 1967.)

[38]Although the State's witness *asserted* that Rumanian law recognizes no property rights in the sense "known in the Western World," the evidence supports no claim of economic insubstantiality. The only contrary evidence consists in broad generalizations charging, in effect, that rights of inheritance are worthless in a "Communist regime of socialized property." (Stoicoiu, *op. cit. supra,* pp. 227, 244.) Rumania has admittedly "embarked upon a program of socialization," but it has not attempted to "nationalize every conceivable kind of property." (*Estate of Kennedy* (1951) 106 Cal.App.2d 621, 629 [235 P.2d 837].) (Cf. *Estate of Larkin, supra,* 65 Cal.2d at p. 85.) The record before us suggests that Rumania, like the Soviet Union, has found it economically and politically impossible to suppress institutions of property and inheritance to the point of economic insignificance. (Cf. *Estate of Larkin, supra,* 65 Cal.2d at p. 86.)

The State of California seeks to escheat the Chichernea estate on the ground that on the date of the decedent's death in 1958 the 1941 Disposition Law[39] required aliens to obtain official approval for the *disposition of the proceeds* of Rumanian estates. Contrary to the assertion of the Attorney General, the Disposition Law in no sense restricted the rights of aliens to enjoy whatever property they might inherit in Rumania; indeed, Article 2 of the 1941 law expressly provided that no prior authorization was required for "acts in connection with the management of [inherited] property rights or interests, [and] acts concerning maintenance." Moreover, the evidence before us furnishes no support for the suggestion that Rumanian authorities relied upon the 1941 Disposition Law to restrict the disposition of legacies *within* Rumania;[40] they simply employed that law to regulate the removal of estate proceeds *from* Rumania.[41] Thus we are called upon to determine whether, in addition to its express requirement that United States citizens be able to inherit "on the same terms and conditions" as nationals of the foreign country, Probate Code section 259 contains a further, implied requirement that there be no limit, absolute or discretionary, upon the ability of our citizens to remove the proceeds of the foreign estate to American soil.

In *Larkin* we recognized that section 259 impliedly requires that the reciprocal property rights accorded by the foreign country meet some minimal standard of economic substantiality. (See *Estate of Larkin, supra,* 65 Cal.2d at pp. 65-66, 84-87.) Nowhere in *Larkin* did we suggest, however, that a United States citizen who inherits such economically substan-

---

[39] See footnote 21, *supra.*

[40] See, e.g., N.H. Angelescu, *op. cit. supra,* pp. 58-59.

[41] Even this limited function of the 1941 law may have lost most of its vitality on August 15, 1947, the date on which the Rumanian Government promulgated Legea nr. 284 [Law no. 284]. That law provided that "all funds representing inheritances which belong to foreigners are transferable from Rumania *without any impediment* in the case where reciprocity is accorded by the respective foreign state." (Italics added.) (N.H. Angelescu, *op. cit. supra,* p. 59.) (See fn. 10, *supra.*) Nonetheless, Legea nr. 335 [Law no. 335] of August 26, 1949, transferring from the Department of National Economy to the Department of Justice the power to regulate remittances from Rumania to foreign soil, casts some doubt on the proposition that the 1947 law effectively established a right to remove estate proceeds from Rumania as of April 15, 1958, the date of the decedent's death in the instant case. We need not resolve that doubt for present purposes, however, since we have concluded, for the reasons set forth hereinafter, that Probate Code section 259 does not require the existence of such a right.

tial interests must *also* enjoy an untrammeled right to remove the proceeds of his inheritance to this country.

The interests of American heirs in foreign estates are not rendered economically negligible merely because the proceeds cannot be readily repatriated to our soil. Ordinarily, an heir is free to visit the foreign country and there enjoy his blocked funds;[42] alternatively, he may dispose of them to relatives or friends within that country.[43] He may also retain his interest in the foreign property, adding the income to the principal until a more favorable legal climate renders remittance to this country less difficult.

Thus we were careful to distinguish in *Larkin* between conditions affecting the *vesting* of economic interests and restrictions affecting only the *transmission* of funds. (See *Estate of Larkin, supra,* 65 Cal.2d at pp. 73-74, fn. 15.) The distinction noted in *Larkin* is not one which we may disregard at will. We do not decide this matter without legislative guidance, for at one time section 259 contained a clause imposing the very requirement which the Attorney General would have this court impose today. Prior to 1945 the statute expressly required that in addition to demonstrating the existence of reciprocal inheritance rights, the foreign claimant also had to establish that under the laws of his country American citizens were entitled "to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign country." (Stats. 1941, ch. 895, § 1.)

In 1945, over a decade before the death of the decedent in this case, the Legislature deliberately struck the latter requirement. (Stats. 1945, ch. 1160, § 1.) The history underlying the Legislature's decision to do so is noted in California Estate Administration (Cont. Ed. Bar, 1959), section 29.5, at page 707: "Section 259 as originally enacted contained a further restriction: the nonresident alien's right to inherit from a California estate was conditioned on United States citizens' rights to receive payment within the United States of money from estates of persons dying within the alien's country. This requirement *which, because of widespread currency controls, would have precluded citizens of most*

---

[42]Although the Attorney General asserts that the 1941 Disposition Law operated to prevent alien heirs from deriving any benefit whatever from such property as they might inherit from Rumanian estates, the record furnishes no support for any such conclusion.

[43]As we have noted above (see fn. 40, *supra*), such disposition has at all times been freely permitted in Rumania.

*foreign countries from participating in California estates* was eliminated by amendment in 1945." (Italics added.)

Entirely apart from the obvious impropriety of our interpreting section 259 so as to reintroduce into the statute a requirement expressly stricken by the Legislature,[44] the construction espoused by the Attorney General would unsettle inheritance relations between California and many, perhaps even most, of the world's nations. The Rumanian law which is challenged as fatal to reciprocity in the present case[45] was a currency regulation imposed by the Fascist government of Rumania in 1941, in the setting of the Second World War. Nearly every nation in the world, including the United States, imposed such restrictions at that time. Few of these restrictions vanished with the end of the war; a majority of nations preserved their currency regulations as they sought to rebuild their war-torn economies without unduly straining their balance of payments. Although Rumania revoked her ban (which was never more than discretionary) in 1959,[46] many nations still impose discretionary, or in some cases absolute, restrictions upon the removal of estate proceeds. (See International Monetary Fund, Seventeenth Annual Report on Exchange Restrictions (1966).)

 The restrictions vary widely in their terms, and many are obscurely phrased.[47] Surely this court cannot undertake to assess the nature and operation of all such restrictions in order to determine which are so onerous as to defeat reciprocity. For us to embark upon any such adventure would

[44]See, e.g., *Subsequent Injuries Fund* v. *Industrial Acc. Com.* (1963) 59 Cal.2d 842, 844 [31 Cal.Rptr. 477, 382 P.2d 597]; *Clements* v. *T.E. Bechtel Co.* (1954) 43 Cal.2d 227, 231-232 [273 P.2d 5]; *Prager* v. *Isreal* (1940) 15 Cal.2d 89, 94 [98 P.2d 729].

[45]See footnote 21, *supra.*

[46]The 1941 Disposition Law was formally abrogated by Rumania on October 5, 1959 (Decret nr. 376 [Decree no. 376]).

[47]Among the nations which the 1966 International Monetary Fund report lists as requiring "official approval" or "licenses" for the removal of estate proceeds are such diverse countries as Australia, Belgium, Brazil, Cameroon, Chad, Finland, Ghana, Greece, Iran, Iraq, Ireland, Luxemburg, Malaysia, Netherlands, New Zealand, and Turkey. Others impose a variety of monetary and geographic limits. Illustrative are the entries for Denmark (p. 177): "Inheritances and gifts to relatives may normally be transferred to any country without limitation. Individual payments above DKr 2,000 as gifts to persons other than relatives require approval from the National Bank"; Spain (p. 496): "For transfers abroad of inheritances and dowries, authorizations are granted liberally when small amounts are involved"; Republic of China (p. 137): "Persons outside the Republic of China who acquired in the Republic assets . . . on account of . . . inheritances . . . are not normally granted the right of transferring them from the Republic."

gravely imperil the constitutionality of section 259 by involving our courts in matters of international monetary policy which may be within the exclusive province of federal authority. (See *Ioannou* v. *New York* (1962) 371 U.S. 30 [9 L.Ed.2d 5, 83 S.Ct. 6] (Douglas, J., dissenting); *Kolovrat* v. *Oregon* (1961) 366 U.S. 187, 195-198 [6 L.Ed.2d 218, 81 S.Ct. 922]; cf. *Clark* v. *Allen* (1947) 331 U.S. 503, 517 [91 L.Ed. 1633, 67 S.Ct. 1431, 170 A.L.R. 953].)

In any event, even if we were disposed to reintroduce into the statute a possibly unconstitutional condition expressly removed by our Legislature, we could hardly give that condition a more demanding construction than it bore when it was an express part of the Probate Code. During that period, our courts consistently held that the condition was *not* broken merely because the foreign country had imposed exchange controls in response to the war. In *Estate of Blak* (1944) 65 Cal.App.2d 232, 239 [150 P.2d 567], for example, the court held that ". . . 'the Legislature did not say *when* United States citizens were to receive payment. It used the words "the rights" to receive. The Legislature therefore necessarily contemplated . . . that the availability of the proceeds of such foreign estates for immediate distribution and payment to United States citizens would be controlled by the exigencies of the battlefield. It placed no time or other limitation as to when payment was to be made.' " Similarly, in *Estate of Miller* (1951) 104 Cal.App.2d 1, 14 [230 P.2d 667], another case involving the pre-1945 statute, the court declared that, although the statute "holds that there must be a reciprocal right to payment, [it] does not require immediate payment, nor payment during a period when both our country and the other country involved have suspended payments for an emergency period."

 The evidence in the present case establishes beyond any doubt that the Rumanian currency regulation, which originally reflected a war emergency, has long since been repealed and has ceased to pose an obstacle to the free transfer of estate proceeds from Rumania to the United States. Accordingly, even an application of our pre-1945 statute would not require escheat.

Finally, even if we were prepared to apply the pre-1945 statute in a new and more rigorous form, the appropriate date for assessing the freedom of our citizens to *remove* inheritance proceeds from Rumania would be the date on which *distribu-*

*tion* of the estate was sought, rather than the date of the decedent's *death.*

Section 259 is silent on the question of *when* the determination of reciprocity is to be made; we may assume in this case that the date of death would furnish an appropriate moment for testing the right to *inherit* property in a foreign country for purposes of section 259.[48] If, however, we were to impose a "right to *remove*" requirement in addition to a "right to *inherit*" requirement, then parity of reasoning would dictate that the determination of whether United States citizens enjoy such a "right to remove" be made on the date when removal of the proceeds is sought. In the present case, the Rumanian heirs did not file their petition to determine heirship until November 1959, after the offending currency regulation had been eliminated; the matter did not reach trial until 1964, nearly five years after the questionable statute had been repealed. Under these circumstances, it would be aimlessly arbitrary for us to defeat the wishes of the decedent by decreeing a forfeiture of the subject estate.

Although Rumanian law imposed temporary restrictions upon the right of United States citizens to *remove* inheritance proceeds from Rumania, we have concluded that we cannot hold such restrictions fatal to the reciprocity required by Probate Code section 259. At all times pertinent to this litigation, the laws of Rumania, as written and as applied, embodied no discrimination against the rights of United States citizens to *inherit* economically significant property interests in Rumania; Probate Code section 259 requires no more. Since our statutes thus interpose no barrier to the right of Californians to leave their estates to citizens and residents of Rumania, the trial court here erred in denying that right.

The judgment is reversed.

Traynor, C. J., McComb, J., Peters, J., Burke, J., Sullivan, J., and Schauer, J.,* concurred.

---

[48]Apart from the effect of the 1941 Disposition Law, Rumanian law remained unchanged between 1958 and 1964 for all purposes here relevant. (See fns. 13 and 15, *supra.*) For this reason, we need not decide in the present case whether the date of death would be the appropriate date for evaluating the right of United States citizens to *inherit* property in Rumania, as some courts have supposed. (See, e.g., *Estate of Giordano* (1948) 85 Cal.App.2d 588, 594 [193 P.2d 771].)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.